[Crim. No. 1990.  Second Appellate District, Division One.—April 29, 1931.]

THE PEOPLE, Plaintiff and Appellant, v. MAX NEWMAN, Defendant and Appellant.

W. Joseph Ford and Mart Coles for Defendant and Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Buron Fitts, District Attorney, and Hugh McIsaac, Deputy District Attorney, for Plaintiff and Appellant.

HOUSER, J.—Defendant appeals from a judgment of conviction, as well as from an order by which his motion for a new trial was denied, as to each of eighteen specified counts of an indictment returned against him wherein he was charged with the crime of presenting false claims of insurance and the crime of presenting false proofs in support of claims upon policies of insurance, each claim presented being made the basis of two counts in the indictment. Without reference to either of the several other reasons urged by appellant, which, if considered tenable, would indicate that the judgment should be set aside and a new trial awarded to defendant, it is deemed necessary by this court to consider but one of such points advanced by ap-

pellant. It relates to the alleged prejudicial misconduct of the deputy district attorney which occurred during and in the course of the trial of the action. Were the misconduct to which reference is had by appellant confined to but an isolated remark uttered by the district attorney either in the heat of argument or in some other mitigating circumstances, it is possible that the ordinary prejudicial effect of such conduct might be so ameliorated that it could not be said that, viewed from the aspect presented from the entire trial of the action, including the evidence, a legal trespass on the constitutional rights of the defendant had been committed. But here, on an examination of the many different specified instances of misconduct of the deputy district attorney, it manifestly appears that on at least twenty different occasions which occurred particularly in the argument by the deputy district attorney to the jury, the criticism of the conduct of such attorney was not only deserving, but that in all probability the verdict of the jury was, or readily may have been, largely influenced by reason of such misconduct. Besides being unproductive of possibly beneficial results to either the litigants herein, or such as hereafter may desire the benefit of judicial precedent, where questions analogous to those here under consideration are or may be involved, neither the inevitable strain upon patience, nor the duty of as early a consideration of waiting appeals as may be judicially practicable, will either justify or permit of more than a passing reference to the several specifications of misconduct of the district attorney herein. For the purpose of more particularly indicating the grounds of the decision, as well as with the object of furnishing example or illustration of the conduct of the deputy district attorney of which complaint is made, the several following situations which occurred on the trial of the action are hereinafter briefly summarized and more or less arranged in groups.

From the proceedings incident to the trial of the action, it appeared that defendant Newman is of the Jewish religious faith. In the course of the argument presented by the deputy district attorney to the jury, among other remarks made by him which injuriously reflected upon the defendant because of his parentage, or because of his sect, and which remarks were calculated to influence the mind of the re-

spective members of the jury against defendant, the following appear:

"I don't know whether it was Mrs. Leary's cow or *Max Newman's grandmother* who started the fire in Chicago. I don't know *what* started the fire in Baltimore, but those two cities were practically wiped out, the heart of them was wiped out in a great conflagration, . . . and if ever a propitious day for a fire arrives when the wind is right, and when the conditions are right and one of these blazes gets away from the firemen, then goodbye to *Los Angeles* and *you*, perhaps. . . .

"I once saw the torso of a little boy friend of mine blackened and dead in the morgue, set by one of the kind of men—brought there *through a fire set by one of the kind of men that we are prosecuting here.* I want you to think a little bit about conditions here and what may come if this is not stopped. There is more of it than you realize— no, I should not go into that. . . .

"Something at the beginning of this trial was said about the *race* of this defendant. I beg of you not to take that into consideration in any way, shape, manner or form, in the trial of this case. He is being tried here simply because we think we have established a criminal charge against him, and I would like him to know, and those connected with him to know, that there is in me no prejudice whatever against the Jewish race. I remember as a small boy of about seven I was taken to my first circus by a kindly Jewish neighbor and I have never forgotten it, and that little thing alone has stricken out any possible prejudice that might have grown up in my mind, but I do think you should take into consideration this: In years gone by *the tide of immigration* that came to this country flowed across the Atlantic and lodged along the Atlantic seaboard first. The older generations remained in those states, and *the second and third began to spread out through the country.* Now, since the completion of the Panama Canal the situation has changed and ships come right to the port of Los Angeles *and immigrants from all over the world,* Russians, Italians, Germans, Swedes—*many of them have grown up in an environment different from ours.* We welcomed them here and we threw open to their children our schools and give them all the vast opportunity that there

is in this country under the most beneficent flag that has ever flown to the sun, and all we ask of *them,* and all we ask of *their children,* is that *they obey the few laws that we have put together here to take care of our safety and our peace and our security, and when you find one of them violating the law, then teach him*—the law is there for punishment and when you find *one of them* violating the law, *put him where the law provides he shall be put.* We ask a verdict of guilty on every count of the indictment. I thank you."

A precedent involving a similar situation is presented in the case of *People* v. *Simon,* 80 Cal. App. 675 [252 Pac. 758, 760], where the authorities are collected and the conclusion reached that remarks of the character of those shown to have been uttered in the instant case constitute prejudicial error. Among other things, it is there said:

"We see no escape from the conclusion that the remarks complained of were calculated to, and no doubt did, *inflame and prejudice the minds of the jurors against the defendant because he happened to be a Jew.* Such remarks should never be made in a court of justice by anyone and, especially, should they not be made by a sworn officer of the law, whose duty it is to see that the defendant has a fair and impartial trial and that he be not convicted except upon competent and legitimate evidence. A district attorney should remember that it is not his sole duty to convict and that to use his official position to obtain a verdict *by appeal to race or religious prejudices,* or any other unfair means, is to bring his office and the courts into distrust. If, indeed, the defendant be a Jew, it is no disgrace and *should not be referred to at all.* It should make absolutely no difference in a court of justice whether the defendant is a Jew, an Englishman, a Frenchman, a German, a Chinaman, a negro, or an American; neither should it make any difference whether he be a millionaire or a pauper. All are equal before the law, and the verdict of the jury should be predicated upon the testimony produced at the trial alone, free from all racial and *religious* prejudices."

Illustrative of the fact that in his argument to the jury the deputy district attorney, being neither under oath nor subject to cross-examination by counsel for defendant, *gave*

*testimony against defendant,* the following excerpts from remarks made by him may be cited:

"He disposes of his Christmas stock, but he disposes of it *to the insurance companies* and, as a matter of fact, *disposed of it to you and me,* because every dollar that is paid by the insurance companies to these men *comes out of your pocket* and my pocket in the form of insurance rates, . . .

" . . . it will cost them at least $10,000. . . .

"*That is your money* and my money too. . . .

"There are such things as *arson rings* and it can be illustrated by what happened in this city a few years ago when a group of men were arrested as principals in an alleged arson ring in Los Angeles. *Prior to that arrest fires were running in this little downtown business district between $80,000 and $100,000 a month,* that is a damage of about $5000 or $6000 loss per fire. For the month of August—these men were arrested the 1st of August and for the month of August fires dropped down *to an average loss of $150 per fire and a total loss of $3000, the same for September and the same for some of the succeeding months. The fires just quit the moment those men got in jail, and it is a little bit of that same kind of work that kept them quiet for a long time, and it is a little bit of that same kind of work I am trying to do with you in this case in so patiently and so earnestly trying to get the evidence in here for you to consider.* . . .

"*I am satisfied some of the goods went in the front doors of that building (defendant's) and almost immediately went out,* and that the bulk of the goods, particularly where the fire raged the hottest, *were old, practically worthless pieces of rags* upon which insurance could be collected. . . .

"I don't know whether any of you ladies have ever been in the mercantile business, but *I* have seen pushcarts on the streets of New York *with goods of just about the description of those down there, and you could buy them by the dozens for 25 cents,* just about the price you could get old, discarded stuff that way, picked up by those pushcart peddlers, . . . *That is just about the character of goods Mr. Bedell (the co-defendant) was buying in Chicago, and* just about the character of goods that a man like Glassgold would pick up for him, *and there isn't a word of truth in* what

little testimony is here of the testimony of Bedell with reference to the amount of money he paid Glassgold. . . .

"It was about the time they moved over to 1012 and got this partition up, because as soon as the partition was there, and a few other preparations made, *the fire was ready* . . .

"When the Russian Eagle Cafe was blown up and burned out here, the man who set *that* fire was in San Francisco— . . .

" . . . *This man (defendant) has made a study of fires,* and if you turn him loose onto the community *you are going to have more* by the fact that he was turned loose. . . .

"There is not any question about the falsity of the books in this case in the 1928 fire if it represents on their face that these goods were worth $111,000. . . .

" . . . They (witnesses introduced by the prosecution) were caught in something that reflected seriously not only on them but the institutions with which they were connected and *they were reluctant to talk to me.* You remember Jackson's testimony how he came to my office and he didn't know anything about this thousand dollars, and I told him Philippi, his co—his friend in this thing—and *I told him Philippi made a statement and he wouldn't believe it, and then I showed him Philippi's signature to the statement and he wouldn't believe it then.* . . .

"*I then showed him the statement of Philippi and still he didn't know anything about this thousand dollars,* and he didn't open his mouth about it until Mr. Delano, the president of the Board of Trade, was brought in and told this man the best thing he could do would be to tell the truth about it, and even then he didn't tell the truth, because just as sure as you are sitting there this thousand dollars that Bedell (co-defendant) was in such a hurry to get on July 26, 1927, was obtained because these men said, 'No signature on this appraisal unless we know the money is up', and I don't know what reputation Bedell had among those men, but they may have heard something of this talk that he was broke and he had no money and they would not act, and Jacobs with that little hundred dollars commission would not have Philippi act until the money was in his hand, and *I say that money was paid over to Jacobs before and not after that appraisal was signed,* although I think it is true they didn't deliver it to Philippi until

later, but he gave Philippi his word that everything was all right. . . .

"Of course, Mr. Bedell (co-defendant) felt they couldn't put the coal oil on him because he had been out of the city about a month before this fire and he comes marching bravely back. *He has not marched bravely back since this indictment was returned.* . . . "

But even with all the foregoing testimony improperly given to the jury by the deputy district attorney, apparently he was not content. In addition to his statement that he was "so patiently and so earnestly trying to get the evidence in here for you (the jury) to consider"—over the unsolicited objection by the judge of the trial court, he insisted upon making a gratuitous attack not only directly upon the institution of courts as administrators of justice generally, but apparently deliberately and by insinuation, upon the integrity of the particular court in which the action was being tried. As shown by the record herein, the following constitute a part of the objectionable remarks made by the deputy district attorney:

"*I am trying to picture to you a little something of the difficulty, both of the prosecution and the defense, for that matter, in handling cases of this kind.* You know, we have five crimes in this state punishable by death. In England not so very long ago there was a hundred and sixty crimes punishable by death, and for years judges without compunction sent boys to death—for crimes against the lordship estate, and things of that kind, *but the judges grew more human. The judges* tried to save some of these boys and *they began to invent quibbles* and they held *this* was immaterial, and *this* was improper, and *this* was not cross-examination, and *they* saved a good many of them, and *those decisions of those judges became a part of the law upon which our present system is based;* have made the basic laws, . . . *Why, a case like this, it is nothing but quibble from end to end.* I put a witness on there and I know that he has in his pocket the written confession of Max Newman that he set this fire—

"Mr. Coles: Just a moment, if your Honor please—

"The Court: Just a moment, Mr. McIsaac.

"Deputy District Attorney: By way of illustration—

"The Court: Just a moment—

"Deputy District Attorney: I didn't—

"The Court: The phraseology of your statement was such as to lead the jury to believe you were stating a fact. It was certainly improper. . . .

"The Court: May the court have at least an opportunity to instruct the jury?— The jury are instructed not to regard any portion of that argument. Wholly forget about it. Bear in mind it was absolutely improper. You may proceed.

"Deputy District Attorney: I join in that request, ladies and gentlemen. I meant to put an 'if' in there. If I knew I put a witness on there, and if I knew that he had the confession of this defendant or any other defendant in his pocket and I would ask him if that were a fact and he said, 'No', I would be bound by it. *And I might quibble around and try to get it out of him—*

"The Court: I don't like to interrupt, but that is not the law as administered in this state; get upon the witness stand with a confession in his pocket and you ask him that question and he denied it; there is specific provision to reach such a thing.

"Deputy District Attorney: I was just going to say *I could fight around—*

"The Court: I am going to stop this argument right now. There is not going to be any more discussion on this proposition of law. You are either not now stating the law or you don't know it.

"Deputy District Attorney: *Well, I will take issue—*

"The Court: I will not permit it. You are either going to conduct this argument as you should or I will stop it.

"Deputy District Attorney: *I am just trying to do my best.*

"The Court: Well, you will have to respect the rulings of the court.

"Deputy District Attorney: Take the witness Rudolph. He sat on that stand as though he were sitting on a cake of dynamite. You know and *I know there was something in his mind that he wasn't willing to tell and he didn't tell.* He was my witness and I can go *just so far* with him. The other side puts a witness on and they ask him *what was the weather* on the date of this. fire and I am confined—no matter *what I want to know about him*—I am confined to asking

him *merely about the weather* on that day, and I am simply saying this and—*I am trying to give you a little of an idea of how hard it is for the prosecution,* and *sometimes* for the defense as well, *to bring out the real facts,* and *it is harder for the prosecution because,* as a rule, the prosecution is trying to *prove the truth* and as a rule *the defendant is trying to conceal the truth.* But I would like to weed out *this entire mass of judge-made law that we have under our present administrative system* and make one rule of evidence, and that is this: When the witness takes the stand he may answer every question put to him by either side or by the court or by a member of the jury that tends to throw light directly or indirectly upon the issues in the case.''

Aside from the breach by the deputy district attorney of the rules of ethical conduct with respect to his relation to a court of justice, it is plain that the purpose of his attack upon the efficiency and the integrity of courts generally was to convey to the jury some idea of his fancied difficulties and the enormous obstacles (?) which he necessarily encountered in his earnest efforts to convict the defendant and thus to secure justice for the people of the state of California; when as a matter of fact he knew, or at least should have known, that each and every statutory or common-law rule of evidence or which relates to the trial of causes which exists in civilized lands is but the result of honest endeavor arising from necessity and from long and patient experience on the part of the members of the ancient judiciary to afford some measure of protection to the weak and the innocent and the oppressed from the greed and the avarice of the rich and powerful and oftentimes from the vindictiveness of some petty individual who, for the moment, may have been either possessed of, clothed with, or at least who exercised an assumed authority. To the credit of the judge who presided at the trial of the instant action, it should be noted that on each occasion when his attention was directed by counsel for defendant to the misconduct of the deputy district attorney, he either sustained the objection interposed by counsel for defendant, or properly directed the jury to disregard the remarks made by the deputy district attorney. But it is clear that in circumstances such as hereinbefore have been described, error of the character of that here under consideration could not have been cured either

by order striking the obnoxious remark from the record, by an instruction to the jury to disregard it, or by any other method, however drastic, which might have been devised and carried into execution. The disastrous effect of the error would but have become the more pronounced.

Concretely, no authority is needed to attest the prejudicial effect on the rights of defendant which resulted to him from the misconduct of the district attorney in charge of the prosecution of the instant case. A serious conflict existed between the evidence presented by the prosecution and that adduced by defendant with reference to his guilt or his innocence. By the provision of our Constitution, the statutes, and all rules adopted for the administration of justice, irrespective of the question of his guilt, defendant was entitled to a *fair* trial on each of the charges preferred against him. That he did not get it is so manifest that neither argument nor authority should be required to satisfactorily establish, if not to practically demonstrate the fact.

The indictment upon which defendant was convicted and to certain counts of which consideration has been given by this court, also in separate counts charged each of the defendants therein named (including this appellant) with the commission in the year 1927 of the additional crimes of (1) "conspiring to commit a felony, to-wit, arson, burning insured property, and presenting false claims of insurance"; (2) "arson"; (3) "burning insured property"; and (4) "bribery of an umpire".

Although some pertinent evidence was presented to the jury relative to the guilt of defendant Newman as to each of such charges, the trial court having been of the opinion that such evidence was insufficient to sustain a conviction of defendant on either of such charges, ordered a dismissal of the action as far as each of them was concerned. From such order the plaintiff has appealed to this court.

The provisions contained in section 1238 of the Penal Code furnish the only instances in situations of the character of that here involved in which the people may appeal from an order made or judgment rendered in a criminal action. By judicial decision it has been held that (syllabus):

"An order granting a motion to dismiss a criminal action made by the defendant on the trial, after issue joined on the merits by plea of not guilty, and not based on any ground specified by statute as cause for setting aside an indictment, but designed solely to prevent the further prosecution of the action upon the ground that the grand jury which found the indictment did not comply with section 1324 of the Penal Code, is not an order dismissing the indictment from which an appeal may be taken, but is an order dismissing the action from which no appeal lies under the statutes of this state. (By Supreme Court on petition for rehearing.)" (*People* v. *Knowles*, 27 Cal. App. 498 [155 Pac. 137].) To the same effect are *People* v. *Bigelow*, 27 Cal. App. 507 [155 Pac. 142]; *People* v. *Antonetti*, 27 Cal. App. 508 [155 Pac. 141]; *People* v. *Solari*, 27 Cal. App. 510 [155 Pac. 141]. See, also, *People* v. *Ellis*, 204 Cal. 39 [266 Pac. 518].

In addition to the 18 separate counts on which defendant was convicted, under counts numbered respectively 18 and 19 of the indictment he was also convicted of each of the separate offenses of arson and of burning insured property in the year 1928. Following such conviction, on motion presented by defendant, the trial court ordered that defendant be granted a new trial as to each of such counts. From such order the plaintiff has also appealed to this court.

Although at the time such order was made the judge of the trial court announced that the ground for granting the motion of defendant with reference thereto was that in his opinion the evidence was insufficient to support the verdict returned by the jury as to each of such counts, it is well settled that "the appellate court is not confined to a consideration of the point upon which a new trial was granted, but will affirm the order if upon the whole record it appears that a new trial should be had". (2 Cal. Jur. 813, and authorities there cited.)

Without reference to the point as to the sufficiency of the evidence to sustain the verdict of the jury, it is clear that, at least because of the misconduct of the deputy district attorney on the trial of the case, the order made by the trial court should be sustained.

It is ordered that the judgment of the superior court and its order by which the motion of defendant for a new trial

was denied as to the 18 counts in the indictment to which reference has been had herein, be and they are reversed. It is further ordered that the order of the superior court dismissing the several counts in the indictment by which the defendant was severally charged with the crimes of (1) "conspiring to commit a felony, to-wit arson, burning insured property and presenting false claims of insurance"; (2) "arson"; (3) "burning insured property"; and (4) "bribery of an umpire"; be and it is affirmed. It is further ordered that the order of the superior court by which a new trial was granted to the defendant as to counts 18 and 19 of the indictment, by which the defendant was charged with the several crimes of "arson" and of "burning insured property" in the year 1928, be and it is affirmed.

Conrey, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 11, 1931, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 28, 1931.

Tyler, J., pro tem., dissented.