[Crim. No. 6708. In Bank. Dec. 16, 1960.]

THE PEOPLE, Respondent, v. PAUL WESLEY
SWEENEY, Appellant.

Paul Wesley Sweeney, in pro. per., Harold J. Ackerman, Joseph Flaig, Gerald D. Lenoir and Crispus A. Wright for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

DOOLING, J.—Defendant was charged with giving away amidone, a narcotic (Health & Saf. Code, § 11500) and with giving a bribe to a deputy sheriff (Pen. Code, § 67). A jury convicted him of both offenses and he was sentenced to the state prison. He appeals from the judgment, the sentence,[1] and the order denying his motion for a new trial.

While defendant does not challenge the sufficiency of the evidence to sustain the verdict on the narcotics charge, he makes these assignments of error: (1) the summary dismissal of his affidavit of prejudice; (2) certain rulings on the admission and rejection of evidence; and (3) serious misconduct of both the court and the district attorney. He particularly stresses the impropriety in the admission of evidence and several instances of misconduct to have been so prejudicially erroneous in their cumulative effect as to constitute the denial of a fair and impartial trial. He also argues that the evidence on the bribery charge established the defense of entrapment as a matter of law.

Viewing the record in the light most favorable to the People, as we are bound to do following a guilty verdict (*People* v. *Caritativo,* 46 Cal.2d 68, 70 [292 P.2d 513]), it appears that defendant, a young Negro lawyer, visited on several occasions one Willie Williams, a female Negro and a narcotic addict, while she was a patient in the Los Angeles County General Hospital. The attendants were suspicious

---

[1] The judgment is the sentence and appealing from both is tautological. The affirmance of the judgment carries with it the affirmance of the sentence. (*People* v. *Carlson,* 177 Cal.App.2d 201, 207 [2 Cal.Rptr. 117].)

that she was receiving narcotics from someone; on two occasions her withdrawal symptoms were relieved after defendant's visits; and finally on his third visit, defendant was observed handing her an object, which proved to be a pill containing a narcotic, amidone. Defendant was seized by a guard and turned over to Deputy Sheriff Nichols of the narcotic detail. With defendant's permission, Nichols searched his car, a 1957 Lincoln. Nichols told defendant that he was not going to do anything in the case until he had an analysis from the crime laboratory, and released defendant.

Later that same day Officer Nichols, following the order of his superior to contact defendant and learn the source of the narcotics, telephoned defendant and asked defendant if he would like to talk with him. Defendant said that he would; the officer then suggested a certain restaurant for their meeting; and defendant agreed, upon being assured that it was not for the purpose of arrest. At the appointed time Nichols was sitting at a table, and two other officers were purposely seated within hearing distance nearby. Defendant, upon joining Nichols, asked if Nichols had discovered the contents of the pill, denied that he knew its contents, suggested that it was only a barbiturate, and stated that Willie Williams had told him she had only swallowed five pills. Nichols then remarked that defendant had a beautiful automobile, to which defendant replied, "I would sure like to see you driving it." Defendant inquired if Nichols had noted a little red book with figures in it, when he was examining defendant's effects at the hospital. When Nichols said that he had not, defendant stated, "Well, if you had seen that book, you would know I am not too wealthy a man. . . . What would be right with you?" Nichols asked, "Well, what won't hurt you?" and defendant replied, "Well, how is $500?" Nichols answered, "Well, that is just fine." They then arranged to meet the next morning at a designated place, and in the course of exchanging greetings, defendant would hand Nichols five $100 bills. During the entire conversation Nichols wore under his coat a small recording instrument known as a miniphone.

The next day defendant and Nichols met as scheduled and the $500 changed hands as agreed. Nichols then placed defendant under arrest and he was taken before a deputy district attorney. Following some discussion of the incident, the deputy asked defendant who first mentioned the $500 and after expressing some uncertainty, defendant said, "Well, I guess I did." Entrapment was one of the issues at the trial.

1. *Dismissal of Affidavit of Prejudice.*

When the case was called for trial on April 13, 1959, defendant filed an affidavit of prejudice against Judge Bayard Rhone, the trial judge, and moved that he disqualify himself. The affidavit referred to sections 170.5 and 170.6 of the Code of Civil Procedure and merely averred that ''Bayard Rhone the judge before whom the trial of the . . . action is pending, is prejudice[d] against the party or the interest of the party so that affiant cannot or believes that he cannot have a fair and impartial trial before such judge.'' The judge denied the motion as ''not setting forth any facts and being frivolous and of no effect,'' and proceeded with the trial.

The motion was properly denied. Section 170.5 was declared unconstitutional insofar as it dealt with a peremptory challenge. (*Austin* v. *Lambert*, 11 Cal.2d 73, 79-81 [77 P.2d 849, 115 A.L.R. 849]; *Muller* v. *Muller*, 141 Cal.App.2d 722, 731 [297 P.2d 789].) Section 170.6, at the time of defendant's motion, applied only to civil actions and special proceedings, not to criminal actions. (Stats. 1957, ch. 1055, § 1; Am. Stats. 1959, ch. 640, § 1, effective September 18, 1959.) Section 170 of the Code of Civil Procedure was therefore the governing statute. [2] Defendant argues that under section 170 the trial judge should have referred the matter of his alleged disqualification to the presiding judge for determination. But section 170 requires the affidavit of bias and prejudice to set forth ''the fact or facts constituting the ground of the disqualification of such [the trial] judge.'' A statement that contains nothing but conclusions and sets forth no facts constituting a ground of disqualification may be ignored or stricken from the files by the trial judge. (*Keating* v. *Superior Court*, 45 Cal.2d 440, 443 [289 P.2d 209]; *People* v. *Lyon*, 135 Cal.App.2d 558, 585 [288 P.2d 57]; *Ephraim* v. *Superior Court*, 42 Cal.App.2d 578, 579 [109 P.2d 378].) Where the statement is insufficient the judge can so determine, whereupon the procedure provided by section 170 is not applicable. (*People* v. *Darby*, 114 Cal.App.2d 412, 439 [250 P.2d 743].) [3] ''Where no facts are set forth in the statement there is no issue of fact to be determined. It is only where an appropriate issue of fact is presented by the statement that a judge is prevented from passing on the question of his own disqualification under section 170.'' (*Mackie* v. *Dyer*, 154 Cal.App.2d 395, 399 [316 P.2d 366].) Defendant's affidavit charging Judge Rhone with prejudice stated no facts but only conclusions, and it was properly ignored.

## 2. *Rulings on Admission and Rejection of Evidence.*

(a) *Photograph representing the scene of the alleged crime.*

 Over defendant's objection, a photograph of the hospital room when defendant allegedly handed Willie Williams the amidone was admitted in evidence. The district attorney admonished the identifying witnesses to disregard the people shown in the photograph and stated that its value was only to show bed positions. A proper foundation was laid for admission of the photograph, and the identifying witnesses testified as to its accurate representation. The court instructed the jury that the photograph was admissible for "purposes of illustration." The probative value of the photograph was a matter for the court to resolve in the exercise of its discretion (*People* v. *Chavez,* 50 Cal.2d 778, 792 [329 P.2d 907]) and it appears to have been properly received as a clarifying representation of the essential scene conditions. (*People* v. *Atchley,* 53 Cal.2d 160, 168 [346 P.2d 764]; *People* v. *Brubaker,* 53 Cal.2d 37, 48 [346 P.2d 8].)

(b) *Impeachment of Officer Beeton.*

 Officer Beeton was the guard who seized defendant at the time he handed Willie Williams the amidone. He was a witness for the People. On cross-examination, in an attempt to show bias and prejudice against defendant, Beeton was asked if he "had told some witnesses not to discuss this matter with anyone from the defense." Beeton replied, "No, never." Later Dr. Tonge, who had treated Willie Williams at the hospital, was called as a witness for the People. On cross-examination, in an attempt to counteract Beeton's denial, Dr. Tonge was asked if Beeton had told him "not to talk to the [defense] investigator." An objection was sustained on the ground a proper foundation had not been laid, the court stating: "The same rule applies to this as it applies to impeachment. You still have to lay the foundation. You cannot lay it generally; you have to lay it specifically on each witness."

Defendant argues that the ruling was error; that the appropriate foundation for impeachment had been laid by the general question asked Beeton, followed by his denial that he had told *anyone* not to talk to defense investigators; that "minor defects in the foundation question should not be seriously considered" (*People* v. *Singh,* 20 Cal.App. 146, 149 [128 P.2d 420]); that "questions as to the making of contradictory or inconsistent statements should be allowed, without laying the formal foundation for impeachment" (*People* v. *Little,*

142 Cal.App.2d 513, 517 [298 P.2d 548]); and defendant "should have had the active cooperation of the court in any good faith endeavors to test the credibility of" an opposing witness. (*People* v. *Hume*, 56 Cal.App.2d 262, 270 [132 P.2d 52].) But defendant's position cannot be sustained where there is not even a suggested attempt, in the so-called foundation question asked of Beeton and his categorical denial, to give the assailed witness any of the particulars of the alleged contradictory statements so that he would know generally the essential circumstances in testing his credibility. Rather here there was not even a purported compliance with the established rule providing for impeachment of a witness "by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them." (Code Civ. Proc., § 2052.) ▮ "The methods prescribed in the code for the impeachment of a witness are exclusive." (*People* v. *Holman*, 72 Cal.App.2d 75, 97 [164 P.2d 297].) ▮ The same reasons of fairness apply in an attempt to show bias or hostility from declarations of a witness as apply in contradictory or inconsistent statements; he must be given a full opportunity for explanation with his attention directed to the particulars set forth by section 2052. (*Ash* v. *Soo Sing Lung*, 177 Cal. 356, 359 [170 P. 843]; 3 Wigmore, Evidence (3d ed.), § 953, p. 512; Witkin, California Evidence, § 650, p. 692; § 670, p. 708.) ▮ Here the question asked Dr. Tonge, whether Beeton had told him "not to talk to the investigator," called for declarations of the witness Beeton. Since a proper foundation had not been laid in the cross-examination of Beeton, the court correctly sustained the objection. (*Estate of Bedford*, 158 Cal. 145, 147-148 [110 P. 302].)

(c) *Tape and wire recordings not produced in evidence.*

▮ At the trial Officer Nichols testified that a recording had been made of his conversation with defendant at their prearranged meeting in the restaurant but when it was played back, no understandable words or sounds could be distinguished, only static. The recording was not introduced in evidence and no further inquiry was made with regard to it. Nichols was then permitted to testify as to the conversation with defendant. Defendant contends that such testimony was

secondary evidence, that the recording was the best evidence of the conversation.

Defendant's contention is without merit. The so-called best evidence rule is inapplicable under such circumstances. ▮ Since the officer was testifying to what he had seen and heard, his testimony was "primary evidence" whether or not "part of the same matter was incorporated into a sound recording." (*People* v. *Sica*, 112 Cal.App.2d 574, 588 [247 P.2d 72].) ▮ In other words, he was not testifying as to what the recording contained but "as to what he observed and knew because he heard it. . . . [His] testimony . . . is not rendered incompetent by the fact of the existence of the [recording]." (*People* v. *Kulwin*, 102 Cal.App.2d 104, 109 [226 P.2d 672]; see anno., 58 A.L.R.2d 1024, 1044-1045.) Nor is defendant's objection tenable that there first should have been a foundation as to the whereabouts of the recording. The record discloses considerable evidence that a thorough search for the recording had been made by sheriff deputies and that it could not be found.

(d) *Use of the hospital records.*

▮ Defendant contends that it was error to permit use of the hospital file for Willie Williams as an aid to several witnesses, personnel of the hospital, to refresh their memories as to entries made by them thereon regarding Willie Williams. One of the nurses so testifying related the hospital record procedure in detail, as a proper foundation for use of the file as a business record. (*People* v. *Terrell*, 138 Cal.App.2d 35, 56-57 [291 P.2d 155].) However, the file was not introduced in evidence. The nurse testified that Willie Williams, while defendant was visiting in the room, asked her to go downstairs to get some money to pay defendant, and that she declined. Over objection, the nurse identified the entry on the hospital record showing that Willie Williams had no valuables on deposit at the hospital. Defendant argues that this was error. The evidence was admissible to show by inference from the absence of money on deposit with the hospital that the request of Willie Williams was a subterfuge to permit her and defendant to be alone.

(e) *Disallowance of testimony as to defendant's reputation for truthfulness.*

▮ An attorney called as a witness by defendant was asked if he knew defendant's "general reputation in the community where he resides for truth and honesty and in-

tegrity." Objection by the People was sustained. The question was then allowed with respect to "integrity" and the witness testified that defendant's reputation for that trait "was excellent." Two other attorneys and a private investigator testified to the same effect. Defendant argues that the court erred in not permitting him to establish that his reputation for truthfulness was good. He had previously taken the witness stand, and he maintains that thereby his reputation for truth, honesty and integrity was in issue, subject to test for credibility by impeachment or otherwise, as any other witness. (*People* v. *Arnold,* 116 Cal. 682, 687 [48 P. 803] ; *People* v. *Hickman,* 113 Cal. 80, 86 [45 P. 175].)

The court's ruling was proper. The cited cases concerned the propriety of defendant's impeachment by showing his prior conviction of a felony. (Code Civ. Proc., § 2051.) But a different situation exists here. The People had not offered evidence that defendant's general reputation in the community for truth was bad. ▇▇▇ It is only in cases where defendant's reputation for truthfulness is challenged by evidence that his reputation for truth is bad that evidence on the other side is admissible. An exception to the rule is when such trait is in issue. (*People* v. *Sellas,* 114 Cal.App. 367, 372-376 [300 P. 150].) Such was not the case here. The fact that defendant had previously testified did not alter the situation. (*People* v. *Cowgill,* 93 Cal. 596, 597-598 [29 P. 228] ; *People* v. *McMillan,* 59 Cal.App. 785, 786-787 [212 P. 38].)

(f) *Cross-examination and impeachment of Willie Williams on her relationship with defendant.*

Willie Williams was called as a witness for defendant. On direct examination she testified that defendant did not at any time while she was in the hospital bring her "any pill or narcotic whatsoever." On cross-examination she admitted that she had recently been convicted of two charges of possessing narcotics; that she had known defendant about two years, beginning in 1957; and that commencing in February 1959, through April 13, 1959, he had visited her in the county jail some 17 times. Over objection, she testified that he had not given her any money. She was then queried about an interview with a Mrs. Mattis, a deputy county probation officer, about the third week in February. Asked if she had not told this probation officer at that time that defendant had helped her financially, she answered, "I don't remember."

Asked if she had not told Mrs. Mattis that she had no monthly income, that she was aided financially by defendant, and that he paid her rent of $3.00 a day and gave her money for food, she answered, "I guess so." She was then asked if she had not told Mrs. Mattis that between 1956 and 1957 she had lived with defendant and there were two children born of the union. Objection was made to the question on the grounds that it was irrelevant and immaterial and no proper foundation had been laid. The objection was overruled. She answered, "I don't remember whether I did or not." She was next asked if between 1956 and 1957 she and defendant had lived in a common-law relationship. After objection that the question was irrelevant and immaterial, she answered, "No, we did not . . . No, I did not live with Mr. Sweeney in any common-law relationship at any time." She was then asked, "You have two children whom you claim Mr. Sweeney is the father, is that not right?" Without objection, she answered, "No." She was next asked if she had not told that to Mrs. Mattis. Again without objection, she answered, "I don't know, I was using narcotics at the time. I might have said anything to this woman." Defendant argues that this whole line of cross-examination was directed to introducing irrelevant matters of a purely personal nature and with the intent to lay the foundation for future impeachment covering these matters.

In rebuttal, Mrs. Mattis was called for the "limited purpose of impeachment" and "attacking . . . the credibility" of Willie Williams. Mrs. Mattis testified that she did have the February conversation with Willie Williams as indicated, that the latter told her that between 1956 and 1957, she, Willie Williams, lived with defendant "in a common-law relationship" and there were two children born as a result of the relationship; that she had no monthly income and was aided financially by defendant, who paid her rent of $3.00 a day and gave her money for food.

Willie Williams was then called for further cross-examination. She was shown two certified copies of birth certificates, which she acknowledged having signed, naming defendant as the father of two sons born to her in 1957 and 1958, respectively. Defendant again objected to such questioning as immaterial, but the objection was overruled on the ground that the question was for the purpose of impeachment and also had a bearing on "bias and prejudice." On redirect examination Willie Williams testified that the certificates

were false. The birth certificates were then introduced in evidence. Defendant's objection on the grounds that they were hearsay and immaterial was overruled. The court told the jury that the certificates were received for the limited purpose of impeachment.

Defendant argues that this whole line of inquiry—the testimony of Willie Williams on cross-examination, the rebuttal testimony of Mrs. Mattis, and the admission of the birth certificates in evidence—was improper as an exploitation of an obviously prejudicial fact in the guise of impeachment going beyond the scope of legitimate cross-examination.

It is universally recognized that a defendant in a criminal action cannot be tried for any offense other than that with which he is specifically charged. "Other acts of criminality or immorality cannot be dragged into the case for the purpose of arousing an atmosphere of prejudice against the defendant or to create a probability of his guilt of the charge of which he is on trial." (*People* v. *Baylor*, 47 Cal. App.2d 34, 38-39 [117 P.2d 425].) He argues that this evidence was introduced merely to degrade and prejudice him before the jury (*People* v. *Crandall*, 125 Cal 129, 135-136 [57 P. 785]); that this showing of an extramarital affair was foreign to the case on trial and cannot be justified as impeachment (*People* v. *Cardinal*, 154 Cal.App.2d 835, 836-837 [316 P.2d 1001]; *People* v. *Burness*, 53 Cal.App.2d 214, 220-221 [127 P.2d 623]); and that this was a "foul blow" struck by the district attorney to secure a wrongful conviction without regard for defendant's right to have the "question of guilt or innocence . . . determined by an orderly legal procedure" and his "substantive rights . . . respected." (*People* v. *Lynch*, 60 Cal.App.2d 133, 143 [140 P.2d 418]; see *Viereck* v. *United States*, 318 U.S. 236 [63 S.Ct. 561, 87 L.Ed. 734].)

The challenged evidence was properly admissible as bearing on the interest and bias of Willie Williams and was not rendered improper because it disclosed defendant's extramarital relationship. The state of mind of a witness as to bias, prejudice, interest involved, friendship or hostility toward a party are all proper subjects for investigation in the trial of a case. (*People* v. *Wayne*, 41 Cal.2d 814, 830-831 [264 P.2d 547]; *People* v. *Gould*, 111 Cal.App.2d 1, 6 [243 P.2d 809]; *People* v. *Payton*, 36 Cal.App.2d 41, 54-55 [96 P.2d 991].) "[T]he admission of such

evidence is error only where it bears no materiality to the issues involved in the case.'' (*People* v. *Payton, supra,* p. 55.)

 This question of the admissibility of evidence for one purpose for which it is properly admissible, where the danger exists that it may be improperly considered by the jury for another purpose to establish which it is not admissible was given careful consideration in *Adkins* v. *Brett,* 184 Cal. 252 [193 P. 251]. The court in that case said at pages 258-259:

''The rule, then, is that the admissibility of such evidence as that under discussion, admissible because competent as to one point, is not destroyed by its incompetency as to other points which it yet logically tends to prove. The danger, however, of the jury misusing such evidence and giving it weight in determining the points as to which it is incompetent, is manifest. In such a situation, as Professor Wigmore puts it . . . 'the only question can be what the proper means are for avoiding the risk of misusing the evidence.' Answering this question, Professor Wigmore says: 'It is uniformly conceded that the instruction [to the jury] of the court [that the evidence is competent only as proof of one point and must not be considered as proof of others] suffices for that purpose; and the better opinion is that the opponent of the evidence must ask for that instruction; otherwise he may be supposed to have waived it as unnecessary for his protection.'

''The general correctness of this statement cannot be doubted. But we doubt if the learned author intended to say more than that the opponent of such evidence is always entitled to such an instruction for his protection, if he asks for it, and that generally it will suffice. But it is not difficult to imagine cases where it would not suffice, and the opponent could justly ask for more. The matter is largely one of discretion on the part of the trial judge. If the point to prove which the evidence is competent can just as well be proven by other evidence, or if the evidence is of but slight weight or importance upon that point, the trial judge might well be justified in excluding it entirely, because of its prejudicial and dangerous character as to other points. A number of the authorities cited by defendant's counsel are distinguishable from the present case upon this ground. This would emphatically be true where there is good reason for believing that the real object for which the evidence is offered is not to prove the point for which it is ostensibly offered and is competent, but is to get before the jury declara-

tions as to other points, to prove which the evidence is incompetent. The same thing would be true as to the introduction of repeated declarations, when once the point for which they are competent has been amply shown. It may also be that the portions of the declaration which there is danger may be misused by the jury are not so interwoven with the balance of the declaration but that they can be disassociated from it without impairing the meaning or effect of the declaration for the purpose for which it is admissible. In such a case, evidence of such portions of the declaration may be excluded on proper objection, when offered, if there is opportunity for such objection, or, if there is not, may be stricken out on motion subsequently. The point of the matter is that the opponent of such evidence, so likely to be misused against him, is entitled to such protection against its misuse as can reasonably be given him without impairing the ability of the other party to prove his case, or depriving him of the use of competent evidence reasonably necessary for that purpose.''

Here it is clear that the point to prove which this evidence was competent could not just as well, or at all, have been proved by other evidence, nor can it be said that this evidence was of slight weight or importance upon the question of the witness' interest and bias. There is nothing in the record to support a conclusion that the real object for which the evidence was introduced was not to establish probable interest and bias or to get evidence before the jury for the purpose for which it was not competent. The prosecution did not introduce repeated declarations, but only the evidence of one conversation and the birth certificates, which were all reasonably necessary to establish the facts relied upon by the prosecution to prove interest and bias. Thus none of the factors stated by this court in *Adkins* as justifying the exclusion of some or all of such evidence was present in this case. This rule of *Adkins* applies equally to criminal prosecutions and ''it is for the trial court in the exercise of its judicial discretion to determine whether its (the evidence) probative value is outweighed by its possible prejudicial effect and to admit or exclude it accordingly. . . .'' (*People* v. *Mc-Caughan*, 49 Cal.2d 409, 421-422 [317 P.2d 974].)

 The court did correctly advise the jury as the evidence was introduced that it was introduced for impeachment and for its bearing on the question of bias and prejudice. If defendant had desired a further instruction more explicitly limiting the evidence to the purpose for which it

was properly admitted, he should have requested the court to give such instruction. In the absence of such request he cannot complain on appeal of the failure to give an instruction on that subject. (*People* v. *White,* 50 Cal.2d 428, 430-431 [325 P.2d 985], citing several cases and expressly overruling two cases in the District Courts of Appeal to the contrary.)

3. *Misconduct of the court.*

(a) *Court's comments as invading the province of the jury.*

▮▮▮▮ Officer Nichols testified on cross-examination that he had made a tape recording from the miniphone he was wearing at the time of his conversation in the restaurant with defendant; that he gave the tape and miniphone to another officer, and that the latter put the wire and miniphone in the safe in the sheriff's office; and that he listened to the tape a day or two before the preliminary hearing. In an attempt to impeach Nichols, one of defendant's attorneys directed his attention to his testimony at the preliminary hearing, when he stated that the miniphone and wire were together when he put them in the safe and that he "did not go back to the safe to look at it or to listen to it after the initial placing." Nichols answered that he had so testified and the court then said, "Well, there is nothing inconsistent there." Defendant argues that the court invaded the province of the jury by undertaking to advise on a matter of fact.

The court at another juncture of the case made a similar statement. A nurse on cross-examination testified that when defendant visited Willie Williams and allegedly gave the amidone to her, the nurse saw defendant's calling card passed to Willie Williams and that she saw nothing written on the side exposed to her view. In an effort to impeach the nurse, defendant's attorney directed her attention to her testimony on the preliminary hearing when she stated that there was nothing "on the back of the card to see if there was something written there." The nurse answered that she had so testified; a discussion as to the consistency of the respective testimony then ensued between the court and counsel; and the court finally said, "I can't see any [inconsistency]." In both instances the court was acting within its power to comment as authorized by the Constitution (Const., art. VI, § 19: *People* v. *Friend,* 50 Cal.2d 570, 576-580 [327 P.2d 97]), and in any event in this extended trial these two comments appear to be of trivial importance.

(b) *Court's refusal to permit defendant's counsel to make a motion.*

During a lengthy discussion between court and counsel as to the method of impeachment that defendant's counsel was following in the course of cross-examination of Officer Nichols and assertedly in an effort to protect the record, defendant's counsel undertook to make a motion to prevent the district attorney from consistently arguing questions of law in the presence of the jury. The court was then in the process of expressing some views on the situation, and when defendant's counsel interrupted to ask permission to make his motion, the court told him that he could not and continued with its own statement. When the court concluded, defendant's counsel expressed no disagreement and continued with the cross-examination. Later in the proceedings, defendant's counsel generally complained of the court's rulings and referred to the prior instance when the court refused to let him make his motion. The court said that it did not then recall such happening, but if that was so, then what motion did defense counsel want to make? Defendant's counsel said that he could not remember "at this late stage." If there was error by the court here, it does not appear to be ground for reversal as prejudicially affecting the outcome of the trial, particularly in view of the fact that the court invited counsel to make his motion when the matter was again called to its attention, and the nature of the contemplated motion does not appear from the record.

4. *Misconduct of the District Attorney.*

(a) In his opening statement to the jury, defendant's counsel stated that he expected to show bias and prejudice against defendant as evidenced by an alleged statement of a deputy sheriff to defendant immediately following his arrest that he should never have "burned" their agent; that several months before this, defendant was talking to one of his clients when a young colored man passed by them; that in his exuberance to let his client know that he knew a colored secret service man, defendant told his client, "That man is a secret service narcotic agent for the Sheriff's Department," and that defendant, in making such remark, exercised bad judgment because the identity of the secret service man should not have been disclosed. At that point the district attorney interrupted to state, "Pardon me . . . are you referring to the client of Mr. Sweeney [defendant] who was a

notorious narcotic peddler in town?'' Defendant's counsel cited this as misconduct but the court replied: ''Proceed. The jury knows that they are going to determine this case from the evidence produced from the witness stand.'' Counsel for defendant asked for no further admonition.

Defendant argues that this remark of the district attorney was entirely out of order and highly improper, in that it was calculated at the outset of the trial to arouse the jury's prejudice against defendant by referring to the fact that defendant had represented people charged with narcotic violations, thus implying that defendant represented unpopular causes and suggesting his own guilt by association. The remark of the district attorney was highly improper, but we cannot believe that this isolated unfair statement at the opening of the trial could possibly have influenced the jury to bring in verdicts of guilty which they would not otherwise have found.

 (b) Officer Nichols, on direct examination, testified that he went to the hospital under his general assignment of duties in connection with the sheriff's narcotic detail. Asked if he had a conversation with anyone on arriving at the hospital, he responded that he had and no one was present. There was no objection. Then Nichols was asked if their conversation involved ''something concerning narcotics.'' Defendant's counsel objected on the ground of hearsay; the objection was overruled, and Nichols answered, ''Yes, sir.'' Defendant argues that the district attorney deliberately asked questions he knew were improper as calling for hearsay and evidencing his bad faith in his conduct of the examination, contrary to his duty to refrain from asking unfair questions. It seems clear that since it was previously established by Nichols that he went to the hospital as an assignment on the sheriff's narcotic detail, there was no prejudicial error in asking the *subject* of his conversation, not the contents, upon arriving at the hospital.

 (c) After the trial had progressed about a week and following a noon recess, one of defendant's counsel reported to the court, when the jury was not present, that he and the district attorney had become engaged in an argument and the latter threatened him with physical violence, to ''slap his teeth in,'' with the district attorney being a man 6 feet 4 inches tall and weighing 200 pounds and the defense attorney being but 5 feet 5 inches tall and weighing 145 pounds; that he therefore wished to withdraw from the case as he felt he was restrained from representing defendant properly. In

explanation, the district attorney said he was goaded by defendant's counsel accusing him of seeking to inflame the jury by remarks of racial prejudice when he himself (the district attorney) was a member of a minority race and certainly never alluded to others on that basis. The court then told the opposing attorneys to observe the legal proprieties, that defendant's counsel need have no fear in making such objections to the court as he deemed appropriate in the course of the trial, and the motion to withdraw was denied. The entire incident occurred without the presence of the jury; therefore, there could have been no prejudice with the jury, and the record reflects that defendant's counsel continued to conduct the case in a thorough and able manner.

(d) On direct examination defendant testified that he had been an attorney since March 1955; that Nichols had requested the $500; and that he had only talked to his wife about the matter. On cross-examination defendant testified that from the time he promised the $500 to Nichols at the restaurant until the next morning, he was very upset and nervous, and that one of the reasons he was willing to pay was to avoid "adverse publicity or notoriety." The district attorney then questioned defendant as to his acquaintanceship with various individuals, whether he had consulted certain named judges and identifying them as prominent members of the "Negro community." Defendant's attorney then challenged the district attorney to make an offer of proof to the court why he was selecting those certain persons. A recess was declared and the court heard opposing counsel on the matter. The district attorney stated that defendant claimed he was "pressured into paying $500," and admitted knowing the several named judges, yet he contacted no "one to whom a young lawyer might turn when confronted with a problem of this kind." Defendant claims that this line of inquiry was a deliberate attempt again to inject the racial issue and was prejudicial. (*People* v. *Newman*, 113 Cal.App. 679, 683 [298 P. 1044].) The People argue that the inquiry as to whether defendant sought advice as to how he might escape his predicament was relevant; that at the start of the questioning with reference to the named judges being leaders in the Negro community, defendant's counsel made no objection; and further, defendant's counsel, in his opening statement, intimated that defendant valued his standing with members of his own race. The People argue that from defendant's failure to contact some prominent member of the Negro race to help

him, a consciousness of guilt might be inferred, and therefore the inquiry was properly pursued as relevant evidence. (*People v. Sykes*, 44 Cal.2d 166, 170 [280 P.2d 769].) Defendant's attorney, on the other hand, argues that he did not make an objection at the outset because he did not realize the district attorney's purpose and motive in pursuing that line of inquiry, and that even though an allusion in the defense's opening statement had been made to defendant's value of his standing in the community with members of his own race, that was not sufficient to invite improper references on the racial issue; and when the improprieties occurred, defendant's attorney properly called the court's attention to them with the request that they be stopped. (*People v. Kirkes*, 39 Cal.2d 719, 725-726 [249 P.2d 1].) While there may be some question as to the propriety of this collateral inquiry, we cannot hold in view of the entire case against defendant that he suffered prejudice thereby.

5. *The Claim That the Evidence on the Bribery Count Showed Entrapment as a Matter of Law.*

In *People v. Makovsky*, 3 Cal.2d 366, 369 [44 P.2d 536], we stated the rule in the following language: "It is unquestionably true that decoys may not be used to ensnare the innocent and law-abiding into the commission of crime when the criminal design originates not with the accused but is conceived in the minds of officers, and the accused is by persuasion, deceitful representation or inducement lured into the commission of a criminal act. When an officer induces a person to commit a crime, which he would not have committed without such inducement, the law will not punish the person so lured into the crime. [Citation.] Under such circumstances the government is estopped by sound public policy from prosecuting therefor. The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite and create crime for the sole purpose of prosecuting and punishing it. While decoys may be used to entrap criminals and to present opportunity to one intending to commit a crime, they are not permitted to ensnare the innocent into the commission of a crime when the criminal design originates not with the accused but is conceived in the minds of the officers, and the accused is by persuasion or inducement lured into a criminal act."

More succinctly we have stated the same rule in the following language: "It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent

people into a criminal career by its officers is what is condemned and will not be tolerated. Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment.'' (*People* v. *Braddock*, 41 Cal.2d 794, 802 [264 P.2d 521]; *People* v. *Roberts*, 40 Cal.2d 483, 489 [254 P.2d 501].) ▪ Again we stated in *People* v. *Terry*, 44 Cal.2d 371, 372-373 [282 P.2d 19] : ''Entrapment as a matter of law is not established where there is any substantial evidence in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused.'' In an extensive discussion of the law of entrapment in *People* v. *Benford*, 53 Cal.2d 1 [345 P.2d 928], this court, while pointing out a difference in the rules of evidence in such cases as applied in the federal courts and the courts of California (53 Cal.2d 8-12), reiterated the rule announced in the previous cases cited and quoted from above (53 Cal.2d 10), and stated the proper test to be ''not, as defendant's argument suggests, whether the prosecution has 'overcome the defense of entrapment' [citation] but, as he states elsewhere in his briefs, whether the prosecution evidence as a matter of law shows entrapment.''

Our problem is therefore to examine the evidence on this phase of the case to determine whether it shows entrapment as a matter of law, i.e., whether as a matter of law it shows that the criminal design originated not in the mind of the accused but in the mind of the officer, and that he was induced by the officer to commit a crime which he would not have otherwise committed (*People* v. *Makovsky, supra*, 3 Cal.2d 366, 369), or whether there is any substantial evidence in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused (*People* v. *Terry, supra*, 44 Cal.2d 371, 372-373).

▪ With this question in mind, the evidence shows that the witness Nichols, a deputy sheriff on the narcotic detail, was sent to the General Hospital on August 28, 1958, to investigate the charge out of which this prosecution grew. He had conversations there with defendant Sweeney, in which Sweeney denied furnishing any narcotics to Willie Williams, and after searching defendant's automobile with his consent, Nichols permitted defendant to get into his car and drive away. After returning to the Hall of Justice and talking to a superior officer, Nichols attempted to telephone to defendant, was answered by a woman on the telephone exchange, and left

word with her to ask defendant to telephone him. Subsequently defendant did call Nichols on the telephone, and Nichols arranged with defendant to meet him at the Cap 'n Quill Restaurant about 7 p.m., and the two went in and sat at a table where Nichols bought defendant a drink. They first spoke of the pill which Nichols had seized at the hospital. Defendant said: "This is sure a terrible mess" and Nichols replied "Yes, it was." After some further conversation about the pill (taking up the narrative of testimony as it appears in the transcript):

"At this point I asked him what year his car was. He stated it was a 1957. I stated, 'It sure is a beautiful automobile.'

"He stated, 'I would sure like to see you driving it.'

"I stated, 'That would be pretty obvious, wouldn't it,' and we both laughed."

After defendant told Nichols that he was not a wealthy man (resuming the transcript):

"Then he stated, 'Well, look, Nichols, . . . I have been around a long time, or I know a lot of boys. Just what is it that you want?'

"I said, 'Just what is it that you want, Paul?'

"He replied, 'Well, as I told you, I am not too wealthy a man.'

"He says, 'What would be right with you?'

"I stated, 'Well, what won't hurt you?'

"He said, 'Well, how is $500?'

"I said, 'Well, that is just fine.' "

It was arranged that the two should meet the next day on the street in front of the Federal Building. At this meeting defendant handed Nichols $500 in bills and Nichols immediately arrested him. Later that day defendant was taken to the office of Don Avery, a deputy district attorney. There (resuming the transcript):

"Mr. Avery . . . says, 'well, who first mentioned the $500?'

"Mr. Sweeney said, 'Well, I want to be honest and fair about this. At this time I just can't remember,' . . .

"Mr. Sweeney started to tell Mr. Avery, or told Mr. Avery that he was, being a nervous——being nervous and panicky, he was like a drowning man. Mr. Avery asked him again who first mentioned the $500 and he stated, 'Well, I guess I did.' "

It is significant that the first suggestion of a bribe came from defendant: "I would sure like to see you driving it."

The fact that Nichols sought the interview and first men-

tioned the automobile might well support an inference that Nichols was suggesting a bribe, but those facts do not compel such an inference. They are equally open to the inference that Nichols had no intention of soliciting a bribe and that Nichols having innocently made the reference to the automobile, the intention to offer it as a bribe was formed in defendant's mind. The choice of which inference is to be drawn from the facts, where more than one reasonable inference is possible, is the function of the jury. (*People* v. *Perkins*, 8 Cal.2d 502, 511 [66 P.2d 631].) "It is not the province of the reviewing court to overturn the jury's verdict when it is supported by substantial evidence including the reasonable inferences to be drawn therefrom." (*People* v. *Cullen*, 37 Cal.2d 614, 625 [234 P.2d 1].) We cannot hold on the evidence in this case that the jury could not reasonably infer that the criminal intent to offer a bribe did originate in the mind of the accused (*People* v. *Terry, supra,* 44 Cal.2d 371, 372-373), and that he was not induced by the officer to commit a crime which he would not have otherwise committed (*People* v. *Makovsky, supra,* 3 Cal.2d 366, 369).

Other claims of error seem too unimportant to require comment.

On the whole case we cannot find that the few errors which occurred were prejudicial in character.

The judgment and order denying a new trial are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., and Peters, J., concurred.

WHITE, J., Concurring and Dissenting.—I would affirm the judgment of conviction on the count of the information wherein defendant was accused of giving away a narcotic in violation of Health and Safety Code, section 11500, but would reverse the judgment wherein the defendant was charged with giving a bribe to a deputy sheriff (Pen. Code, § 67).

I am satisfied that the factual background surrounding the charge of offering a bribe to Deputy Sheriff Nichols is replete with evidentiary facts which bring it within the rule announced by this court in *People* v. *Makovsky,* 3 Cal.2d 366, 369 [44 P.2d 536] and the other cases relied upon in the majority opinion, and in which cases we find unequivocal denunciation of officers of the law inducing a person to commit a crime which, without such inducement, he would not have committed. True, the law does not frown upon the entrap-

ment of a criminal and, where an accused has a preexisting criminal intent, the law permits his solicitation by a decoy and, if the accused succumbs to the opportunity offered him by the decoy, there is no inference of unlawful entrapment. However in the case now engaging our attention, the evidence points unerringly to the conclusion that the proposal of a bribe was conceived in the mind of the law enforcement officer whose conduct and inducement lured defendant into a criminal act. As was stated in *People* v. *Makovsky, supra,* 3 Cal.2d 366, 369, ''When an officer induces a person to commit a crime which he would not have committed without such inducement, the law will not punish the person so lured into the crime. [Citations.] . . . The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite and create crime for the sole purpose of prosecuting and punishing it.'' That is exactly what occurred in the instant case.

It should be remembered that notwithstanding what occurred at the General Hospital, defendant was not arrested but was permitted to depart. Now, who arranged for the next meeting? The answer is clear—Deputy Sheriff Nichols. The record reveals that after the latter returned to the sheriff's office and talked with a superior officer, Deputy Nichols attempted to contact the defendant by telephone and, being unsuccessful, left word for the latter to contact the deputy sheriff. This defendant did, whereupon Officer Nichols asked defendant if the latter would like to talk with him. Defendant acquiesced and the deputy sheriff suggested a restaurant in the Civic Center of Los Angeles for such meeting. Upon the assurance that the proposed meeting was not for the purpose of arresting him, defendant agreed to keep the appointment. To make the occasion of the meeting more friendly, Officer Nichols bought the defendant a drink. After some conversation, as set out in the majority opinion concerning the content of the pill allegedly delivered by defendant at the General Hospital, in whose mind did the idea and suggestion of a bribe arise? Let the record speak for itself. As shown in the majority opinion, Deputy Sheriff Nichols testified, ''At this point I asked him [defendant] what year his car was. He stated it was a 1957. I stated, 'It sure is a beautiful automobile.' To this defendant replied, 'I sure would like to see you driving it'.'' The majority opinion holds that this statement constituted the first suggestion of a bribe. I am inclined to the view it was rather an answer to the sug-

gestion of a bribe by the officer. The facts and circumstances surrounding the bribery phase of this case are fairly set out in the majority opinion and it is unnecessary to here repeat them. Suffice it to say that the evidence shows that the original criminal design—so far as the crime of bribery is concerned—originated in the mind of the officer and his superior. We are not here concerned with a case wherein one is engaged in the business of selling contraband goods such as narcotics and by means of a decoy is afforded an opportunity to ply his trade. In such cases the use of a decoy to afford the suspect an opportunity to engage in his illegal operations rightly does not amount to unlawful entrapment. The crucial question before us is in whose mind did the intent to commit the crime of bribery originate?

As I view the evidence it points unerringly to the conclusion that as a matter of law defendant had no intent to bribe Officer Nichols but was solicited and induced to do so by the latter, thereby bringing the instant case squarely within the rule of unlawful entrapment as a matter of law.

While a departure from those seasoned and long-established rules of procedure in criminal cases may well result in justice for the particular defendant before the bar, such practice is dangerous to the community and may well lead to opening the door for conviction of the innocent. Respect for the law can never be inspired by its lawless enforcement.

Appellant's petition for a rehearing was denied January 10, 1961. White, J., was of the opinion that the petition should be granted.