[Crim. No. 8054. Second Dist., Div. Two. Nov. 27, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ERNIE ADOLPHUS SMITH, Defendant and Appellant.

William Herbert Hall for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert H. O'Brien, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Defendant, Ernie Adolphus Smith, and his codefendant, Jessie James Lieser,* were jointly charged with burglarizing the Hughes Electronics Company on May 26, 1961. They were also charged with three counts of forgery and one count of conspiracy to commit forgery. They were acquitted of the burglary charge and convicted on the other four counts. Smith has appealed from the judgment and sentence.

It appears that the premises of the Hughes Electronics Company were broken into during the night of May 26. Among the things stolen was a group of blank company payroll checks numbered from 325 to 400. The signature, E. E. Hughes, appearing on each of these checks was not the signature of Elroy Hughes of the Hughes Electronics Company. Also missing was a check bearing the number 106 and the genuine signature of E. E. Hughes.

On the afternoon of May 28, three of these checks in the amount of $71.42 each were passed at the Fox Market, 3024 Sepulveda Boulevard, Mayfair Markets, 8770 West Pico and Sav-On Drug Store, 3010 Sepulveda Boulevard. These checks were passed by defendant Lieser who was operating under the name of Traynum Edward Wade. He made small purchases in each of these stores, tendered one of the forged checks and

---

*Apparently defendant Lieser did not appeal.

received the difference in cash. He also presented a driver's license in the name of Traynum Edward Wade as identification. A cash register receipt showing the name of the mercantile establishment and the amount of the purchase was placed in the respective grocery bags.

At about noon on that day, Officer John A. Huie of the Los Angeles Police Department "received a radio call that two male Negroes were selling watches in the parking lot behind Sav-On and Fox Market." The report indicated that the watches had been stolen. The officer went to the designated area to investigate the suspected theft of the watches and their reported sale. Upon reaching that locality, the officer stopped a colored boy by the name of Campbell, whom he had previously known, and inquired "Where is your buddy that was selling watches?" The boy "indicated that he was behind the Fox Market in that parking lot selling the watches." Pursuing his investigation in the area, the officer first observed defendant Smith "walking down a little alley by a parking lot." The officer asked him if he knew anything about selling watches. Defendant replied that "he didn't know anything about selling watches." The officer then asked him "where he was coming from and where he was going. He said he was just looking for a job and was going over to Sepulveda Boulevard to catch a bus." The officer immediately recalled that there are no busses on Sepulveda. The officer asked him for his identification. Apparently at this time he gave the officer his name. The officer asked defendant if he had a car. He said "no," that his mother was using the car that he owned. The officer then radioed police communications to find out if defendant was wanted or if he had a prior record. He was advised that defendant was wanted on two outstanding traffic warrants. The officer asked defendant about them. He replied that "he just forgot to pay for them." It was at this point that defendant was placed under arrest.

The officer asked to see his wallet. Defendant produced it and "removed a paid receipt for a '57 Renault." He was asked about this vehicle and stated that his mother had it. The officer thereupon made a search of the immediate area for a Renault. He found one but it was not registered to defendant. He then walked over to another Renault. The officer's partner brought defendant to this vehicle. Defendant then stated, "That is my car." The officer inquired, "Where is the registration?" Defendant said, "It should be in the glove compartment." The officer looked in the glove compartment, from

which the door had been removed. The officer removed a large envelope, believing that the registration might be in it. Instead he found the pack of blank payroll checks of the Hughes Electronics Company. There was also a slip of paper in the envelope bearing what appeared to be a list of stores and their addresses. The officer then asked defendant if they could search the trunk. Defendant replied, ''Go ahead.'' Upon opening the trunk, they found five or six large shopping bags full of groceries, in each of which was a cash register receipt from the market at which they were purchased.

At the West Los Angeles Police station, Officer Huie searched defendant and removed from his inside shirt pocket a social security card and a driver's license, each of which was in the name of his codefendant, Jessie James Lieser. The officer asked defendant, ''Who do these belong to?'' Defendant replied, ''that was the guy that got away.'' The officer then asked him why Jessie had given him these documents. Defendant replied that Jessie didn't want to have them found on him if he got caught. Search of the defendant also disclosed that he had $270 on his person. The officer asked him if he had been working and he said ''no.'' The officer then said, ''How come all the money?'' Defendant replied, ''Every time Jessie comes out of a market he gives me the money and he goes into another market.'' The money was folded half-way and was in five or six packets. Defendant Smith's explanation of his connection with these transactions was that he had received a telephone call from some unknown woman who wanted him to take Jessie around to various markets. He knew the checks were being passed and was supposed to park his car and walk away, and Jessie was supposed to go in and cash the checks.

At the trial defendant denied any complicity in the forging and passing of these payroll checks. He claimed that he had never seen them until the officers showed them to him. He denied ever having Lieser's social security card or driver's license in his pocket. He claimed he did not know how the groceries got in the trunk of his car. Defendant's sole contention is that the evidence used to convict him was obtained as a result of an unreasonable search and seizure and in violation of his constitutional rights and was therefore not admissible. The People, on the other hand, argue that the evidence was obtained as the result of a search of defendant's automobile, based on probable cause and with his consent.

It will be recalled that initially Officer Huie had received a radio call stating that two male Negroes were selling watches

in the parking lot behind Sav-On and Fox Market. It was indicated that these watches had been stolen. The officer went there for the purpose of investigating the theft and sale of the watches. When he reached that locality he made inquiry of a colored boy whom he knew as to "where his buddy was that was selling watches." The boy indicated that he was operating in the parking lot behind the Fox Market. Upon seeing defendant in the alley, he stopped him and inquired, *inter alia,* where he was going. Defendant replied that he was going over to Sepulveda Boulevard to catch a bus. This naturally created suspicion in the officer's mind for he knew there were no busses running on Sepulveda. The officer asked and obtained his name and then inquired if he had a car. Defendant told the officer that his mother was using the car that he owned. The officer also asked him if he could see his wallet. Defendant produced his wallet and removed a paid receipt for a 1957 Renault. The officer asked him about this vehicle, to which he replied that his mother had it.

Defendant's lack of information relative to the operation of busses on Sepulveda and his obviously false statement that he was headed for Sepulveda to catch a bus, reasonably led the officer to suspect that defendant was lying about not having a car there. This caused the officer to explore the parking lot to see if he could locate defendant's car for if defendant did have his car there, the officer might reasonably expect to find in it some of the watches that had been stolen and that defendant assertedly had been attempting to sell. Upon discovery of defendant's car in the parking lot and defendant's admission of its ownership, the officer noted the absence of the registration slip and inquired of defendant where it was. He replied, "It should be in the glove compartment." The officer could reasonably interpret this statement as indicating that it was all right for him to look into the glove compartment for the registration. The officer did look into the compartment without any objection on the part of defendant and found a large envelope containing the payroll checks here in question. Whether consent was given by defendant to investigate the contents of the glove compartment was primarily one of fact for the trial court to determine. (*People* v. *Hood,* 149 Cal.App.2d 836, 838 [309 P.2d 135]; *People* v. *Michael,* 45 Cal.2d 751, 753 [290 P.2d 852]; *People* v. *Gorg,* 45 Cal.2d 776, 782 [291 P.2d 469].) And failure to object is evidence of consent. (*People* v. *Torres,* 56 Cal.2d 864, 867 [17 Cal.Rptr. 495, 366 P.2d 823]; *People* v. *Elliott,* 186 Cal.App.

2d 178, 182 [8 Cal.Rptr. 795].) Implicit in the court's ruling is the determination of the issue of consent in favor of the People. Thus the evidence in the glove compartment was not obtained as the result of an illegal search or seizure. ■■ The fact that defendant was then in custody does not make his consent to the officer's examining the contents of the glove compartment involuntary per se. (*People* v. *King,* 175 Cal. App.2d 386, 389 [346 P.2d 235] ; *People* v. *Melody,* 164 Cal. App.2d 728, 734 [331 P.2d 72].) The fact defendant was in handcuffs does not negate his consent. (*People* v. *Lujan,* 141 Cal.App.2d 143, 147 [296 P.2d 93] ; *People* v. *Valdez,* 188 Cal.App.2d 750, 756 [10 Cal.Rptr. 664].) ■■ Upon finding the batch of payroll checks, the officer naturally wanted to make further exploration of the car so he asked defendant if he could search the trunk. Defendant said, "Go ahead." There the officer found the five or six shopping bags of groceries with cash register receipts therefor. Obviously this evidence was obtained through consent; not as an incident to his previous arrest. ■■ The fact that the search produced something different from that for which the officers were initially investigating does not render it invalid. The officers did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which the search was initiated. (*People* v. *Roberts,* 47 Cal.2d 374, 379 [303 P.2d 721] ; *People* v. *Griffin,* 162 Cal.App.2d 712, 715 [328 P.2d 502] ; *People* v. *Jackson,* 198 Cal.App.2d 698, 703 [18 Cal.Rptr. 214].)

■■ It appears that the officers acted reasonably at each stage of this investigation, that by reason of defendant's untruthful answers the officers properly pursued the investigation to the point of discovering defendant's car in the parking lot, and that defendant voluntarily consented to the officers' examination of the contents of the glove compartment and the trunk. It cannot be said, therefore, as a matter of law, that the search which produced the payroll checks and the bags of groceries was either unreasonable or illegal. Defendant's position, therefore, that the incriminating evidence against him was inadmissible cannot be sustained.

The judgment (the affirmance of which carries with it the affirmance of the sentence (*People* v. *Sweeney,* 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049] ) ) is affirmed.

Ashburn, J., and Herndon, J., concurred.