Filed 8/20/25  P. v. Manor CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C098456 |
| v. | (Super. Ct. No. 21FE003868) |
| ROBERT MANOR et al., | |
| Defendants and Appellants. | |

Defendants Robert Manor and Victor Merle Gray conspired to kidnap and murder Raymond Wright.  Manor wanted Wright dead because Wright seriously injured Manor and his wife in a car crash while driving under the influence.  Gray agreed to kidnap and bring Wright to Manor in exchange for payment.  After Gray did so, Manor poisoned Wright, whose body was never found.

Defendants were tried together and convicted of first degree murder and kidnapping for reward.  With respect to the murder, the jury found a special circumstance allegation to be true, and as for the kidnapping, the jury found that defendants caused

1

great bodily injury or death. The trial court sentenced each defendant to state prison for life without the possibility of parole.

Gray now contends:

1. The jury was improperly instructed on consciousness of guilt.

2. The prosecutor improperly referred to potential punishment during closing argument.

In addition, Manor and Gray contend:

3. The jury was instructed on an invalid theory of murder liability -- conspiracy to commit murder -- and the only valid theory, direct aiding and abetting, is not supported by substantial evidence.

4. Gray kidnapped Wright for payment, not reward.

5. Their privilege against self-incrimination was violated when a prosecution witness said defendants "know what happened."

6. The trial court should not have admitted Gray's unredacted statements against Manor.

7. The trial court erred in omitting Gray's name from the CALCRIM No. 334 instruction on accomplice testimony.

8. Cumulative prejudice requires reversal.

We conclude Gray's prosecutorial misconduct claim was forfeited, his alternative ineffective assistance claim fails, and the joint contentions by Manor and Gray do not establish a basis for reversal. We will affirm the judgments.

BACKGROUND

In November 2011, Wright caused a car crash while driving under the influence, seriously injuring Manor and his wife, who were in the other car involved in the crash. Wright was convicted of felony driving under the influence and ordered to pay more than $275,000 in victim restitution.

2

Two or three years later, Manor began receiving massage therapy from T.T. to alleviate pain from his injuries. T.T. testified that Manor told her about the car crash and the driver who injured him. At some point, Manor and his wife separated, and he began an off-and-on romantic relationship with T.T. Manor often complained about pain and repeatedly told T.T. he was "gonna get Ray Wright."

Around the same time period, Manor briefly dated Katelan Barnard, who testified that Manor told her about the car crash and that he wanted to "get" Ray Wright. In addition, J.L., who described himself as a dear friend of Manor, testified that Manor was looking for Wright and said he wanted to "[f]uck him up."

By January 2018, Barnard was in a romantic relationship with Gray, one of Manor's friends. Wright rented a carpentry shop from Barnard's uncle, which was located on the property where Barnard lived.

On the day of the murder, January 11, 2018, Gray asked Barnard to let him know when her uncle left the property and when Wright arrived. At 9:50 a.m., she sent Gray a text message saying that Wright was in front of the shop. Gray asked her to make sure her uncle was gone. Just before 10 a.m., Barnard sent Gray two text messages saying "you are good" and "Unc's gone." Gray texted Barnard: "Okay, I need some time, text me if anything changes." Barnard watched the driveway to see if anyone returned.

What happened next is taken primarily from Gray's statements during a jailhouse conversation with cellmate Chris Mitchell following Gray's arrest. Gray said Manor asked him for help locating someone, and offered to pay Gray to bring the person to Manor. Gray told Mitchell that he brought the person to Manor's Sacramento house, where Manor was waiting for him with plastic laid out on the floor. Mitchell testified that Gray said he was paid some money and left. Mitchell further testified that he did not remember Gray saying that anything happened to the person while he was there. However, in a prior statement to law enforcement, Mitchell said Gray told him that Manor poisoned the person, and after the person was dead, Manor and another friend,

3

Mark Nyquist, cut the body up. Gray told Mitchell he was not there for "the chopping up," but he was there for the poisoning. Gray said Manor was supposed to pay him $10,000 for bringing the man to him, but only gave him about $1,000. Gray felt "burned" by Manor.

On January 13, 2018, Wright's brother went to Wright's house to check on him, as he had not heard from Wright in days. When he went inside, a man yelled: "Get outta here." Wright's brother froze and the man ran. Wright's brother called 911 and reported a burglary. A drink cup from a convenience store was found on Wright's kitchen counter. DNA matching Gray's profile was found on the cup.

A couple days after the murder, Gray told Barnard that Manor had hired him to bring Wright to Manor's Sacramento house but he "had not gotten paid for it." Gray gave Barnard a note that he wanted her to deliver to Manor. A week or two later, Barnard met Manor at a cemetery. When Barnard told Manor what Gray had told her, Manor admitted killing Wright, adding that he did not owe Gray anything and would not pay him anything.

Manor also made incriminating statements to J.L. and T.T. Sometime after the murder, J.L. went over to Manor's Sacramento house. Gray and Nyquist were also there. Nyquist was cleaning up something in the garage. Although J.L. did not say what it was during his testimony, in an earlier statement to law enforcement, he said "they were cleaning up . . . some blood." As that was happening, Manor came into the living room and told J.L.: "I got him" or "[g]ot 'em." On another occasion sometime after this interaction, while J.L. was housesitting at Manor's house, he found a note from Gray to Manor that he referred to as a "fuck you note" or a " 'you owe me' note."

T.T. testified that Manor called her around that time and asked her to come over to talk. When T.T. arrived, Manor told her: "I got him." T.T. understood this to mean that "he got Ray Wright" because she "never heard him speak about anybody else like that." Manor was excited when he made this statement. About a week later, Manor told

4

T.T. that he wanted to give Gray her car for his help in "the whole Ray Wright situation." Manor did not say what Gray did to help, but he did say that three other people were involved: Gray, Barnard, and Nyquist. At the time, the car was in T.T.'s name, but in Manor's possession, so she took it back to prevent him from giving it to Gray.

On January 21, 2018, 10 days after the murder, law enforcement found Wright's truck parked in North Highlands. Portions of the headliner carpet of the truck's camper shell tested positive for blood. DNA matching Wright's profile was extracted from the blood stain on the carpet.

About a week later, January 27, 2018, a CHP officer started to pull Gray over in his van for driving with an expired registration. Rather than pull over, Gray led the officer on a high speed chase and crashed the van into another vehicle. Gray was arrested for driving under the influence and taken to the hospital for a broken leg. A search of the van uncovered a tarp containing a hat with "Ray Wright Design" printed on it, an inoperable cell phone that appeared to have been smashed with a hammer, a rain jacket and a piece of burlap with blood stains on them, and a wallet containing Wright's driver's license and credit cards. DNA matching Wright's profile was extracted from the blood stain on the rain jacket.

Gray made incriminating statements to his wife during a jailhouse visit following his arrest. Gray told his wife he had been using the van to clean up the scene. Gray said he was returning the van when he was arrested, adding: "He used me, man, [']cause he knew I was vulnerable . . . . He knew I needed money, you know what I mean? And . . . he pounced on it. 'Cause he couldn't do it himself."

DISCUSSION

I

Gray contends the jury was improperly instructed that his flight from law enforcement two weeks after the murder could show consciousness of guilt.

5

During the instruction conference, the parties and the trial court discussed whether to give the jury the standard flight instruction, CALCRIM No. 372, or the more general instruction on evidence of consciousness of guilt, CALCRIM No. 378. The trial court decided to give the more general instruction because Gray's flight did not occur immediately after the crime was committed or immediately after he was accused of committing the crime. (See CALCRIM No. 372 ["If the defendant fled . . . (*immediately after the crime was committed/ [or] after (he/she) was accused of committing the crime*) . . . ." (italics added)].) Gray's counsel objected to giving an instruction on consciousness of guilt.

As given to the jury, CALCRIM No. 378 stated: "If Defendant Gray fled or tried to flee after he was pulled over by law enforcement on January 27th, 2018, that conduct may show that he was aware of his guilt. If you conclude that Defendant Gray fled or tried to flee after he was pulled over by law enforcement on January 27th, 2018, it is up to you to decide the meaning and importance of that conduct. However, evidence that a defendant fled or tried to flee cannot prove guilt by itself."

In reviewing Gray's assertion of instructional error, we must determine whether the instruction was supported by substantial evidence. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) Gray argues the challenged instruction was not supported by substantial evidence because his flight from law enforcement two weeks after the kidnapping and murder, while driving under the influence and with evidence connecting him to Wright's murder in the back of his van, "did not support an inference of consciousness of guilt of murder or aggravated kidnapping." Instead, Gray argues, he might have fled because he did not want to be arrested for driving under the influence, or because he did not want to be "dragged into [an] investigation of Manor's crimes." However, so long as consciousness of guilt is one reasonable inference from Gray's conduct, the instruction was properly given. (See *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1290-1291.)

6

"The presence of substantial evidence supporting [an] instruction is not undermined by the existence of other interpretations of the evidence." (*Id*. at p. 1291.)

Here, fleeing from law enforcement while driving a van containing evidence connecting Gray to Wright's murder certainly supports an inference that Gray was aware of his guilt. The fact that he might have had other reasons to flee from law enforcement was a matter for the jury. (See *People v. Sweeney* (1960) 55 Cal.2d 27, 51 ["The choice of which inference is to be drawn from the facts, where more than one reasonable inference is possible, is the function of the jury."].) Indeed, the instruction itself informed the jury that "it is up to you to decide the meaning and importance of that conduct."

Gray's contention lacks merit.

## II

Gray next contends the prosecutor improperly argued to the jury that Gray might receive a lesser sentence than Manor.

During closing argument, while explaining accomplice and co-conspirator liability generally, the prosecutor stated that accomplices or co-conspirators "are just as guilty as the perpetrators," although they "might get a different sentence from the Judge depending on their role" in the commission of the crime. The prosecutor later reiterated: "This law holding aiders and abettors and co-conspirators equally guilty is a disincentive to those people: 'Stay away, don't get involved in this, you're going down, just the same as everyone else. Might get a different sentence but you're going down." Gray's counsel did not object to this line of argument.

"As a general rule, ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' [Citation.] The defendant's failure to object will be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct." (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).)

7

"A prosecutor's misstatements of law are generally curable by an admonition from the court." (*Ibid*.)  There is no reason that a prosecutor's improper reference to punishment could not similarly be cured by admonition.  (See *People v. Martinez* (2010) 47 Cal.4th 911, 958 [a prosecutorial misconduct claim based on claimed references to punishment during closing argument was forfeited for failure to object].)

Gray has not persuaded us that an objection would have been futile, or that the prosecutor's argument was "so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*Centeno, supra*, 60 Cal.4th at p. 674.) Gray's contention is therefore forfeited.

Anticipating this conclusion, Gray asserts that he received ineffective assistance of counsel.  "An ineffective assistance of counsel claim has two elements: a defendant must show that their counsel's performance was deficient, and that this deficient performance prejudiced the defense.  [Citation.]  A reviewing court can begin an ineffective assistance of counsel inquiry with either element and need not address both elements if one is not satisfied." (*In re Tellez* (2024) 17 Cal.5th 77, 88, italics omitted.)

Here, there is no reasonable probability of a more favorable result had counsel objected to the challenged comments.  Had such an objection been made, the trial court would likely have admonished the jury that it was not allowed to consider punishment in determining guilt.  But the jury had already been instructed not to consider punishment: "In your deliberations, you may not consider or discuss penalty or punishment in any way when deciding whether a special circumstance or any other charge has been proved." Absent a contrary indication, we presume the jury followed that instruction.  (*People v. Gray* (2005) 37 Cal.4th 168, 217.)  Moreover, the evidence of Gray's guilt was so strong that the two brief references to a possible different punishment do not undermine confidence in the verdict.  (*Id*. at p. 207.)

8

## III

Manor and Gray contend their murder convictions must be reversed because the jury was instructed on a theory of murder -- conspiracy to commit murder -- that is no longer valid after Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) eliminated murder liability based on imputed malice.  They add that the only valid alternative theory of murder liability -- direct aiding and abetting -- is not supported by substantial evidence.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).)[1]  Senate Bill 1437 "narrowed or eliminated certain forms of accomplice liability for murder." (*People v. Curiel* (2023) 15 Cal.5th 433, 440 (*Curiel*).)  In addition to narrowing the application of the felony-murder rule, Senate Bill 1437 eliminated the natural and probable consequences theory as a viable theory of murder liability. (*Id*. at pp. 448-449.)  It accomplished the latter change by amending section 188 to provide:  "Except as stated in [section 189, subdivision (e)], in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

The prosecution pursued two theories of first degree murder in this case: (1) conspiracy to commit first degree murder; and (2) direct aiding and abetting. Defendants do not dispute that direct aiding and abetting remains a viable theory of murder liability after Senate Bill 1437.  This is " 'because a direct aider and abettor to murder must possess malice aforethought.'  [Citation.]" (*People v. Medrano* (2021) 68 Cal.App.5th 177, 183 (*Medrano*); see *Curiel, supra*, 15 Cal.5th at p. 462.)  Instead, defendants argue conspiracy to commit murder was the prosecution's primary theory,

---

[1] Undesignated statutory references are to the Penal Code.

9

but the theory is no longer valid because it imputes malice to a criminal defendant through evidence that the defendant participated in another crime, the crime of conspiracy. We disagree that the theory is no longer valid.

Conspiring to commit murder remains a viable theory of murder liability after Senate Bill 1437. (*People v. Virgen* (2025) 110 Cal.App.5th 440, 451; *People v. Richee* (2025) 111 Cal.App.5th 281, 294 ["the prosecution may seek to establish the defendant's liability as a participant in a conspiracy to commit murder, without relying on the natural and probable consequences doctrine"].) This is because " 'all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.' [Citation.]" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641; see *Medrano, supra*, 68 Cal.App.5th at p. 183.) As the jury in this case was properly instructed, in order to find defendants guilty of murder based on this theory, the People had to prove that: (1) the defendant "intended to agree and did agree" with one or more of the other alleged members of the conspiracy (i.e., the other defendant, Nyquist, or Barnard) "to intentionally and unlawfully kill;" (2) the defendant "and one or more of the other alleged members of the conspiracy intended that one or more of them would intentionally and unlawfully kill;" (3) one or more of the alleged conspirators committed at least one of the alleged overt acts (e.g., abducting Wright or transporting him to the murder site); and (4) at least one of those overt acts was committed in furtherance of the agreement to kill Wright. The instruction also referred the jury to the murder instructions as to whether "the [d]efendant and one or more of the other alleged members of the conspiracy intended to commit murder," but admonished the jury: "[D]o not consider implied malice" because "[c]onspiracy to commit murder requires an intent to kill" and "[t]he People must prove that the members of the alleged conspiracy had an agreement and intended to commit murder."

Assuming, as defendants do, that they were convicted of murder based on the theory of conspiring to murder Wright, the jury necessarily found that they possessed

10

express malice aforethought. In other words, malice was not imputed based solely on their participation in a crime. (§ 188, subd. (a)(3).) Instead, their commission of the uncharged crime of conspiracy to commit murder necessarily required that each possessed the intent to kill. (See *People v. Whitson* (2022) 79 Cal.App.5th 22, 32 ["Had the jury been fully instructed with respect to conspiracy to murder . . . its guilty verdict would have encompassed the finding that Whitson intended to kill."].)

Defendants' reliance on *Curiel* is misplaced. There, the jury was instructed on direct aiding and abetting and the natural and probable consequences doctrine. (*Curiel, supra*, 15 Cal.5th at p. 446.) The prosecutor argued both theories. (*Id.* at p. 445.) Curiel filed a petition for resentencing under section 1172.6 alleging that he could not currently be convicted of murder because of the changes made by Senate Bill 1437, i.e., the elimination of the natural and probable consequences doctrine as a viable theory of murder liability. This "put[] at issue all elements of the offense under a valid theory." (*Id.* at p. 462.) Thus, notwithstanding the jury's additional finding that Curiel possessed the intent to kill, that was "only one element" of direct aiding and abetting liability. (*Id.* at p. 463.) It did not, "standing alone, cover all of the required elements." (*Ibid.*) Here, however, the jury was not instructed on the natural and probable consequences theory, or any other now-invalid theory. Instead, it was properly instructed on two valid theories, direct aiding and abetting and conspiracy to commit murder. Because the jury convicted defendants of murder under one of those valid theories, *Curiel* is inapposite.

Having concluded that conspiracy to commit murder remains a viable theory of murder liability after Senate Bill 1437, we note that defendants' briefing does not directly challenge the sufficiency of the evidence supporting that theory. However, during oral argument, Gray's counsel suggested that the evidence did not support a finding that Gray intended to kill. And Gray's briefing, attacking the sufficiency of the evidence supporting the prosecution's alternative aiding and abetting theory, although focused on whether cellmate Mitchell's testimony was reliable enough to support a reasonable conclusion that

11

Gray "remained at the crime scene while Manor and Nyquist carried out the [murder]," suggests an argument that the evidence is also insufficient to support a conclusion that Gray intended for Wright to be murdered.

We therefore briefly address the sufficiency of the evidence supporting the jury's implied finding that Gray "intended to agree and did agree . . . to intentionally and unlawfully kill" Wright, with the specific intent that "one or more of [the conspirators] would intentionally and unlawfully kill," and that Gray kidnapped Wright in furtherance of that agreement. The kidnapping itself is supported by overwhelming evidence, which need not be repeated here. Strong evidence also supports a conclusion that the kidnapping was committed in furtherance of a conspiracy to commit murder. Gray's letter to Manor admits to having "hand delivered . . . revenge" to Manor. The fact that an agreement was reached ahead of time for that revenge is evidenced by Gray demanding payment. He told Barnard that Manor hired him to bring Wright to Manor's house but he "had not gotten paid for it." He also told cellmate Mitchell that Manor was supposed to pay him $10,000, but only gave him about $1,000. Finally, the jury could have reasonably concluded that the agreement was for Gray to bring Wright to Manor's house in order for Manor or another conspirator to kill him. Strong evidence supports a conclusion that Manor wanted Wright dead for causing the car crash that injured Manor and his wife. Manor himself stated on multiple occasions that he wanted to "get" Wright. And after the murder, he told two people that he "got him." There was also evidence Gray told Mitchell that he brought Wright to Manor's Sacramento house, where Manor was waiting for him with plastic laid out on the floor. Although there was conflicting evidence as to whether Gray was present during the actual murder, it was for the jury to assess the weight of the evidence, and evidence was presented that Gray told Mitchell he was there for the poisoning. A reasonable inference from all of the evidence is that Gray's admitted "hand deliver[y]" of revenge meant that he kidnapped Wright and brought him to Manor's house so that Manor could kill him.

12

Having concluded that conspiracy to commit murder remains a valid theory of murder liability, and that this theory is supported by substantial evidence, we need not address defendants' argument that the other valid theory, direct aiding and abetting, is not supported by substantial evidence. This is because the verdict must be upheld so long as there is substantial evidence supporting at least one valid theory. (*People v. Silva* (2001) 25 Cal.4th 345, 370.)

IV

Defendants also claim their kidnapping for reward convictions must be reversed because Gray kidnapped Wright to receive payment from Manor, not for a reward.

As relevant to the facts of this case, section 209, subdivision (a) provides: "A person who . . . kidnaps . . . another person . . . with intent to hold or detain, or who holds or detains, that person for . . . reward, . . . or a person who aids or abets any such act, is guilty of a felony." The jury was accordingly instructed that the People had to prove the following elements: (1) the defendant "kidnapped, abducted, seized, confined or carried away a person"; (2) the defendant "held or detained that person"; (3) the defendant "did so for reward;" and (4) the person "did not consent" to those actions. Regarding the "reward" element, the instruction defined that term to mean "something given in return for good or evil done or received and especially something that is offered or given for some service or attainment." As with the murder charge, the jury was also instructed on conspiracy to commit kidnapping and principles of aiding and abetting.

During closing argument, the prosecutor argued that Gray kidnapped Wright in exchange for a reward, i.e., payment, from Manor. Manor, by agreeing to pay Gray to kidnap Wright, both aided and abetted the crime and conspired with Gray to have the crime committed. The prosecutor also quoted the instruction's definition of "reward" in arguing that Manor's payment qualified.

Defendants challenge the instruction's definition of "reward" as being too broadly synonymous with "compensation." They argue such a broad definition does not comport

13

with a proper reading of the aggravated kidnapping statute and also "violates the constitutional prohibition on vague criminal statutes."

Questions of statutory interpretation are subject to de novo review. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]" [Citation.] " 'When the language of a statute is clear, we need go no further.' " ' " (*People v. Scott* (2014) 58 Cal.4th 1415, 1421.)

Section 209, subdivision (a) prohibits, as relevant here, the kidnapping of a person with the intent to hold or detain the person "for ransom, reward, or to commit extortion or to exact from another person any money or valuable thing . . . ." Stated simply, the crime "requires the deprivation of a person's liberty for the purpose of obtaining a financial gain." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 367 (*Greenberger*).)

The definition of "reward" provided in the challenged instruction, CALCRIM No. 1202, was taken from *Greenberger*, which held "that the word 'reward' is not a technical term requiring separate definition for the jury." (*Greenberger, supra*, 58 Cal.App.4th at p. 367.) The court explained that the California statute relating to aggravated kidnapping is based upon the federal Lindbergh Law enacted in 1932, and that a reward includes something offered or given for some service or attainment. (*Id*. at pp. 367-368.) Because "reward" would be commonly understood by persons of ordinary intelligence, there was no error in failing to define the term for the jury. (*Id*. at p. 368.)

Defendants argue that "*Greenberger* was wrongly decided, or at least has been overextended in its application." We disagree. *Greenberger* correctly held that the jury need not be instructed on the definition of "reward" because it has a common meaning that would be understood by the average person. However, this does not mean that a trial

14

court cannot give the jury that common meaning as part of the aggravated kidnapping instruction.  In this context, "reward" means something given in exchange for an action or service, whether good or evil.  As defendants note, that could include payment from a victim's family or associates to secure a victim's release, but it also includes the payment of money from Manor to Gray in exchange for Gray's action or service in kidnapping the victim.  Regardless of where the money came from, Gray received a reward in the form of a cash payment for kidnapping Wright.  And Manor aided and abetted that aggravated kidnapping by hiring Gray to do it.

We also disagree with defendants' conclusory assertion that the challenged definition of "reward" renders the statute unconstitutionally vague.  " 'The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of "life, liberty, or property without due process of law," as assured by both the federal Constitution [citation] and the California Constitution [citation].  Under both Constitutions, due process of law in this context requires two elements:  a criminal statute must " 'be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt.' "  [Citations.]' [Citation.]"  (*People v. Morgan* (2007) 42 Cal.4th 593, 605.)  There is a " 'strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.  [Citations.]  A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' [Citation.]"  (*Ibid*.)  *Greenberger* provides such a construction for the statutory term reward, and we agree with that construction.  The fact that it encompasses defendants' conduct does not make the statute unconstitutionally vague.

V

Defendants further assert that their privilege against self-incrimination was violated when Barnard testified that defendants "know what happened."

15

Barnard was granted immunity for her truthful testimony. During cross-examination, Manor's counsel asked whether she would be prosecuted for perjury if her testimony was not what the prosecutor expected. Barnard responded that if she did not "tell the truth and stick to the terms" of the immunity agreement, "then . . . immunity is not granted." Manor's counsel then asked: "Who defined the truth?" Barnard answered: "I know what happened and these gentlemen (indicating) know what happened." At the next recess, Gray's counsel objected to Barnard's statement on the ground that it violated Gray's privilege against self-incrimination, arguing that Barnard inferred that Gray "needs to testify, to tell the truth." The trial court responded that it did not "see it that way" and concluded the jury would not interpret the statement to imply that the defendants had an obligation to testify.

In *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106] (*Griffin*), "the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.) And although a prosecutor may comment "upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses," he or she "may commit *Griffin* error [by arguing] to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided only by the defendant, who therefore would be required to take the witness stand." (*Ibid.*, italics omitted.)

Defendants argue Barnard's statement amounted to *Griffin* error. However, "there is no California authority supporting [their] claim that a *witness's* testimony concerning a defendant testifying constitutes *Griffin* error." (*People v. Noriega* (2015) 237 Cal.App.4th 991, 1003 (*Noriega*).) Indeed, in *Noriega*, although the defendant forfeited his claim that a witness's testimony violated *Griffin*, the appellate court addressed the issue under the rubric of ineffective assistance of counsel and concluded "reasonably competent counsel would not have raised a *Griffin* error objection" to similar

16

witness testimony because *Griffin* error does not extend to witness testimony, as opposed to prosecutorial comment. (*Ibid.*)

Nevertheless, defendants urge this court to follow two federal decisions, *United States v. Sylvester* (5th Cir. 1998) 143 F.3d 923 and *United States v. Rocha* (5th Cir. 1990) 916 F.2d 219, holding that a witness's comment on a defendant's failure to testify can amount to *Griffin* error. The same argument was made and rejected in *Noriega*. We agree with the *Noriega* court's assessment that those federal decisions merely cite to *Griffin*, "without a pinpoint cite, for authority that a witness's comment can constitute *Griffin* error, but *Griffin* does not stand for that proposition." (*Noriega, supra*, 237 Cal.App.4th at p. 1003.) As in *Noriega*, we "decline to extend *Griffin* beyond its plain language to include a witness's testimony." (*Ibid.*)

## VI

In addition, defendants contend the trial court erred in admitting Gray's incriminating statements against Manor under Evidence Code section 1230 without redacting them to exclude reference to Manor.[2]

## A

The People moved in limine to admit (1) Gray's letter to Manor demanding payment for delivering him revenge, (2) Gray's statement to Barnard that he brought Wright to Manor but Manor did not follow through on his promise to pay him, (3) Gray's statements to his wife during the jailhouse visit admitting that he used the van to clean up

---

[2] Gray's joinder indicated that he joined Manor's appellate arguments generally and as specifically set forth in the joinder letter. But he also indicated he was joining in "aspects" of Manor's arguments. As Gray acknowledged, "each appellant must spell out exactly how the error caused a miscarriage of justice." Gray does not do so with respect to the incriminating statements contention and the contention involving omission of Gray's name, but in any event, we do not perceive any prejudice flowing to Gray from the admission of his own statements against Manor, or in the omission of his name from CALCRIM No. 334.

the scene and that Manor took advantage of Gray's need for money, and (4) Gray's statements to his cellmate Mitchell admitting that he kidnapped Wright in exchange for payment, that Manor gave him less than he was promised, that plastic was laid out ahead of his arrival with Wright, and that Gray was present when Manor killed Wright by poisoning him. The People argued the statements were admissible under Evidence Code section 1230 as statements against Gray's penal interest and that redaction was not required. Manor moved to exclude the statements.

The trial court separately analyzed each statement and admitted them under Evidence Code section 1230 against both Gray and Manor without redaction. Because we are reviewing the trial court's ruling, not its reasoning, we need not set forth that reasoning in detail. (See *People v. Brooks* (2017) 3 Cal.5th 1, 39.) To provide context, however, we note that the trial court concluded: "[I]n sum, after considering each statement individually and the total context in which it was made and the context of all the other statements, . . . even if they contain slight portions that might not be independently disserving of [Gray's] penal interests, they are still not self-serving but, rather, inextricably tied and part of a specific statement against penal interest such that a reasonable person in [Gray's] position would not have made the statements unless he believed them to be true."

B

"Although hearsay statements are generally inadmissible under California law (Evid. Code, § 1200, subd. (b)), the rule has a number of exceptions. One such exception permits the admission of any statement that 'when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected [the declarant] to the risk of civil or criminal liability, . . . that a reasonable [person] in [the declarant's] position would not have made the statement unless he [or she] believed it to be true.' (Evid. Code, § 1230.) As applied to statements against the declarant's penal interest, . . . the rationale underlying the exception is that 'a person's interest against being criminally implicated

18

gives reasonable assurance of the veracity of [the] statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 710-711 (*Grimes*).)

"To demonstrate that an out-of-court declaration is admissible as a declaration against [penal] interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.]" (*Grimes, supra*, 1 Cal.5th at p. 711.)

There is no dispute that Gray was unavailable as a witness, having invoked his Fifth Amendment right not to incriminate himself. (See *People v. Duarte* (2000) 24 Cal.4th 603, 609-610 (*Duarte*); Evid. Code, § 240, subd. (a)(1).) As for the remaining requirements, Manor argues the trial court should have required redaction of the portions of Gray's statements that implicated Manor because they were not reliable and were not specifically disserving to Gray's penal interests.

" 'In determining whether a statement is truly against [the declarant's penal] interest . . . and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*Grimes, supra*, 1 Cal.5th at p. 711.) "Ultimately, . . . 'whether a statement is self-inculpatory or not can only be determined by viewing it in context.' [Citation.]" (*Duarte, supra*, 24 Cal.4th at p. 612.)

Evidence Code section 1230 "does not authorize the admission of 'those portions of a [declarant's] confession that are self-serving or otherwise appear to shift responsibility to others.' [Citation.]" (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 71 (*Gallardo*).) For example, " 'a hearsay statement that is facially inculpatory of the declarant may, when considered in context, also be exculpatory or have a net exculpatory effect.' [Citation.]" (*Ibid*.) That was the situation in *Duarte*, where the

declarant's post-arrest statements to police "tended sympathetically to describe [his own] participation in the shooting" while "minimiz[ing] his responsibility" and "imply[ing] that others . . . should bear a greater share of the responsibility." (*Duarte, supra*, 24 Cal.4th at p. 613.) Similarly, in *Gallardo*, the declarant provided generally incriminating statements to two paid informants, but shifted most of the blame to two codefendants. The appellate court held the declarant's statements about his codefendants' conduct were too self-serving and unreliable to qualify as statements against the declarant's penal interest. (*Gallardo,* at p. 74.)

However, the against-penal-interest exception does allow "the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' [Citation.]" (*Grimes, supra*, 1 Cal.5th at p. 715.) For example, in *People v. Samuels* (2005) 36 Cal.4th 96 (*Samuels*), the declarant said to an acquaintance that he killed the victim with the help of another person and that the defendant paid him to do so. (*Id*. at p. 120.) The California Supreme Court held the statement "was properly admitted as a statement against penal interest." (*Ibid*.) Rejecting the argument that the "assertion 'that [defendant] had paid him' for the killing was either collateral to his statement against penal interest, or an attempt to shift blame," the court explained: "This admission, volunteered to an acquaintance, was specifically disserving to [the declarant's] interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the evidence]. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id*. at pp. 120-121.)

"We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion." (*Grimes, supra*, 1 Cal.5th at p. 711.)

C

Beginning with Gray's letter to Manor, it was written by a co-conspirator in a kidnapping and murder to another co-conspirator in those crimes. The letter was plainly self-inculpatory. Far from attempting to exculpate himself, Gray demanded payment for his vital role in the conspiracy, "hand deliver[ing]" Manor's "revenge." Gray said he did "more than [his] job" and also said he had "everything handled" and made sure "it all point[ed] to [Gray]." Although those statements also inculpated Manor because they imply that Manor agreed to pay Gray for his services, that implication is inextricably tied to Gray's self-inculpatory statements demanding payment for his role in the conspiracy to kidnap and murder Wright. (See *Samuels, supra*, 36 Cal.4th at pp. 120-121.)

Turning to Gray's statements to Barnard, Gray told Barnard he brought Wright to Manor but Manor did not pay him. Those statements admit Gray's role as the kidnapper in a kidnapping for hire. As with the letter to Manor, they also inculpate Manor as the person who hired Gray to kidnap Wright. But again, that is an inextricable part of the self-inculpatory statements. Like *Samuels*, and unlike *Duarte* and *Gallardo*, Gray's statements to Barnard did not tend to describe his role in a sympathetic light, or minimize his responsibility, or shift blame to Manor. Gray admitted kidnapping Wright for Manor, and he wanted to be paid for it. The statements are plainly self-inculpatory, even though they also implicated Manor.

Gray's statements to his wife following his arrest were also self-inculpatory in nature. Gray admitted he used the van to clean up the scene, and he was returning the van when he was arrested. Gray said everyone knew who wanted Wright, referred to the car crash that injured Manor and his wife, and said "he couldn't do it himself." In those statements, Gray admitted cleaning up the scene, and implied that he kidnapped Wright to

21

help Manor because Manor wanted Wright and could not kidnap Wright himself. Viewed in context, the statements implicated both Gray and Manor in a conspiracy to kidnap and murder Wright, and the statements implicating Manor were inextricably tied to the self-inculpatory statements.

Regarding Gray's statements to his cellmate, Gray told Mitchell that Manor offered to pay him to bring Wright to him. Gray brought Wright to Manor, where Manor was waiting for him with plastic laid out on the floor. Gray told Mitchell that Manor poisoned Wright. Manor and Nyquist then "[c]ut the body up." Gray was not there for "the chopping up," but he was there for the poisoning. Gray told Mitchell that Manor agreed to pay him $10,000, but only gave him about $1,000. Gray felt "burned" by Manor. Those statements were the most self-inculpatory of all. Gray also provided the most detail regarding Manor's role in the events, directly inculpating him in the murder. However, at no point did Gray attempt to minimize his own role. Again, he complained that he did not get paid what he was owed for the kidnapping. He implied that the murder was planned ahead of time, and he did not claim to be surprised by the fact that plastic was laid out, or that Manor killed Wright in Gray's presence, or that the body was later dismembered. As in *Samuels*, the portions implicating Manor do not reduce Gray's culpability and are inextricably tied to Gray's statements implicating himself in the conspiracy to kidnap and murder Wright. (See *Samuels, supra*, 36 Cal.4th at pp. 120-121.)

Finally, in addition to the requirement that the statements be against the declarant's penal interest, they also " 'must be clothed with indicia of reliability.' " (*Duarte, supra*, 24 Cal.4th at p. 614, quoting *People v. Shipe* (1975) 49 Cal.App.3d 343, 354.) None of the challenged statements were made in circumstances indicating a lack of reliability, such as "where the declaration is made to authorities after the declarant has been arrested and charged with a serious offense or after he has pled guilty to a lesser offense and is awaiting sentencing and where . . . the statement is exculpatory in the sense that the

22

declarant has blamed a coparticipant for the commission of the greater offense while admitting complicity to some lesser degree." (*Shipe*, at p. 354.) Instead, the statements in Gray's letter to Manor were made to a co-conspirator, demanding payment for Gray's role in the conspiracy, before the crimes came to light. His statements to Barnard were made to a romantic partner, also before the crimes came to light. And Gray's statements to his wife and cellmate, while made after he was found with incriminating evidence in his van, were nevertheless made to people he appeared to trust, and not made during questioning by police, as in *Duarte* and *Shipe*, or to paid informants, as in *Gallardo*. (See also *People v. Cortez* (2016) 63 Cal.4th 101, 128 ["nothing in the attendant circumstances undermines the trial court's conclusion that [the declarant's] statements were truly disserving of his interests"].)

VII

Defendants claim the trial court erred in omitting Gray's name from the CALCRIM No. 334 instruction on accomplice testimony. They acknowledge, however, that the People will be able to cite cases suggesting strongly that their argument is wrong.

Section 1111 provides in relevant part: "A conviction [cannot] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . . [¶] An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

"If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request. [Citation.] Of course, an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others. [Citations.]" (*People v. Brown* (2003) 31 Cal.4th 518, 555 (*Brown*).)

23

There can be no doubt that Gray and Manor were accomplices. And although Gray did not take the witness stand against Manor at trial, " '[t]estimony,' as used in section 1111, includes ' "all out-of-court statements of accomplices . . . used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police." ' [Citation.]" (*Brown, supra*, 31 Cal.4th at p. 555, italics omitted.) Gray's out-of-court statements were used as substantive evidence of Manor's guilt. As we explained in the preceding section of this opinion, they implicated both Gray and Manor in the kidnapping and conspiracy. However, as we also explained, they were not " ' "made under suspect circumstances." ' " (*Ibid*.)

" 'The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is itself sufficiently reliable to be allowed in evidence.' [Citation.]" (*Brown, supra*, 31 Cal.4th at pp. 555-556, italics omitted.) In *Brown*, the California Supreme Court held that an accomplice's out-of-court statements that were admitted as declarations against his penal interest were "made under conditions sufficiently trustworthy to permit their admission into evidence despite the hearsay rule," and "[t]herefore, no corroboration was necessary, and the [trial] court was not required to instruct the jury to view [his] statements with caution and to require corroboration." (*Id*. at p. 556.) So too here.

In any event, as in *Brown*, any assumed error "was manifestly harmless. 'A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" . . . The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]' [Citation.]" (*Brown, supra*, 31 Cal.4th at p. 556.) Gray's statements were corroborated by other evidence, including testimony

from various witnesses who testified to Manor's own incriminating statements, e.g., that "he got Ray Wright."

## VIII

Finally, each defendant asserts that cumulative prejudice requires reversal. However, having concluded that each of defendants' contentions was either forfeited or lacked merit, and the one forfeited contention did not result in ineffective assistance of counsel because the failure to object was harmless, there is no cumulative prejudice to assess.

## DISPOSITION

The judgments are affirmed.


_____/S/_____
MAURO, J.



We concur:



_____/S/_____
HULL, Acting P. J.



_____/S/_____
DUARTE, J.